ALLIED CAPITAL CORPORATION, a Maryland corporation, Plaintiff,

v.

GC–SUN HOLDINGS, L.P., a Delaware limited partnership, GC–Sun G.P., Inc., a Delaware corporation; GC–Sun Holdings II, L.P., a Delaware limited Partnership; GC–Sun G.P. II, Inc., a Delaware corporation; GC–Sun Frontier Investors, LLC, f/k/a/ Brafasco Investors, LLC, a Delaware limited liability company; Brafasco Holdings II, Inc., a Delaware corporation; Glencoe Capital Partners II, L.P., a Delaware limited partnership; Glencoe Capital, LLC, an Illinois limited liability company; and John Does 1–10, Defendants.

C.A. No. 1954–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 18, 2006.
Decided: Nov. 22, 2006.

Daniel B. Rath, Rebecca L. Butcher, James S. Green, Jr., Landis Rath & Cobb, L.L.P., Wilmington, DE; Daniel M. Litt, Jeffrey Rhodes, Addy Schmitt, Dickstein Shapiro Morin & Oshinsky, L.L.P., Washington DC, for Plaintiffs.

Raymond J. DiCamillo, Elizabeth C. Tucker, Richards, Layton & Finger, P.A., Wilmington, DE; Janet Malloy Link, B. John Casey, Meghan H. Sullivan, Latham & Watkins, L.L.P., Chicago, IL, for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

The plaintiff, Allied Capital Corporation ("Allied"), brought this case in an effort to collect on a promissory note. Allied claims that the insolvent debtor, GC–Sun Holdings, L.P. ("Sun I"), a Delaware limited partnership, would have had the wherewithal to either repay the note in full, or at least the principal amount, had Sun I's general partner—a controlled affiliate of defendant Glencoe Capital Partners II, L.P. ("Glencoe")—not embarked on a scheme by which Allied's claim on the note was subordinated to a new equity investment made by an affiliate formed by Glencoe for the purpose of making that investment. Allied has mounted a jurisprudentially-intergalactic campaign to recover on the note. It has sued all of the affiliated entities of Glencoe that were possibly involved in the disputed equity investment as well as the unidentified human beings who served those affiliated entities as officers and directors. Allied's causes of action are numerous, and include counts for breach of contract, breach of the implied covenant of good faith, tortious interference with contract, breach of fiduciary duty, aiding and abetting breach of fidu-

ciary duty, fraudulent conveyance, civil conspiracy, and unjust enrichment.

The numerous defendants have moved to dismiss certain discrete aspects of Allied's bounteous pleading for failure to state a claim upon which relief can be granted. This opinion resolves that motion.

First, the decision addresses the counts in Allied's complaint pleading breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with contract claims. Allied premises those claims on the notion that the note prohibited Glencoe and any of its affiliates from making the disputed equity investment. But there is a fundamental flaw in Allied's theory. By its express terms, the note only prohibited Sun I or its subsidiaries from incurring any "indebtedness for borrowed money" to Glencoe or its affiliates. The new equity investment is plainly not "indebtedness for borrowed money." Despite all of its assertions in the complaint that it had extracted a contractual prohibition on any form of investment by Glencoe and its affiliates that was superior to or equal in priority to the note held by Allied, Allied cannot escape the plain and unambiguous language of the note itself. That language clearly proscribed Glencoe and its affiliates from making a debt investment in Sun I or any of its subsidiaries. Had the sophisticated parties to the note meant to preclude Glencoe from making "equity" investments in those entities, they would have said so. Instead, they chose to restrict only "indebtedness for borrowed money." Although other legal doctrines— such as equitable principles of fiduciary duty or statutes addressing fraudulent conveyances—might condemn the equity investment if its terms were unfairly advantageous to Glencoe, the plain terms of

the note preclude the notion that the note itself forbade that investment.

This is another in a long line of cases in which a plaintiff has tried, unsuccessfully, to argue that the implied covenant grants it a substantive right that it did not extract during negotiation. The promissory note explicitly addressed what types of investment were forbidden, and thus also impliedly addressed the types of investment were not subject to contractual restriction. Accordingly, Allied's implied covenant claim, like the claims of plaintiffs before it that have implored this court to award new contract rights, fails. Allied's theory— that the note's explicit prohibition of "indebtedness for borrowed money" constituted an implicit ban on any equity investment in Sun I or its subsidiaries that would have the same "practical effect" as a debt investment—is contrary to Delaware's law of contracts. Restrictive covenants in contracts, like promissory notes, that limit the commercial freedom otherwise available to the parties cannot reasonably be read in the squishy and uncertain manner Allied suggests. When an issuer negotiates an agreement that only precludes it—as a matter of contract—from making a discrete form of investment, it is entitled to rely upon the words of the contract. To rule otherwise would turn the contractual relationship on its head, forcing the issuer to prove that its apparently unrestricted right to make equity investments was not implicitly precluded by the note's limited explicit prohibition on "indebtedness for borrowed money." Restrictive covenants are carefully negotiated and our law requires that their unambiguous terms be given effect. When a noteholder is only able to obtain a contractual restriction on "indebtedness for borrowed money," it is stuck with that, and cannot, as an "oh by the way," claim that it never occurred to it to argue for a broader restriction on equity investments in subsid-

iaries—especially when any reasonable negotiator would have recognized that the words "indebtedness for borrowed money" entirely fail to address equity investments. To permit the noteholder to claim that the issuer breached an implied covenant, and to grant it a right that it clearly did not obtain at the bargaining table, would involve a judicial rewriting of the contract and would disrupt the value that flows from interpreting clear contracts as written.

Because Allied's tortious interference claim depends on the viability of its breach of contract claim, that claim also fails.

The second major issue on appeal is whether a claim can be pled against Glencoe and its affiliated entities for civil conspiracy. The defendants contend, with little explanation, that, as a result of their corporate relatedness, they cannot, as a matter of law, conspire with one another. The issue presented implicates a muddy area of Anglo–American jurisprudence and the parties have done little to help clear the murk.

Because of the lack of clarity, I have approached the question presented with caution. At this stage, I hold only that a conspiracy claim can be pled on the unique facts of this case, where Allied (in simple terms) has alleged that a parent entity (Glencoe) concocted, in bad faith, a scheme whereby one of its controlled, first-tier subsidiaries was rendered unable to pay its debts because Glencoe, the first-tier subsidiary, and a second-tier subsidiary permitted Glencoe's newly formed affiliate to obtain an equity interest in a third-tier subsidiary for an unfair value. Before the new equity infusion, the third-tier subsidiary's equity was entirely owned by the second-tier subsidiary, whose equity was entirely owned by the first-tier subsidiary. The contention is therefore that, through concerted action, the parent and its affiliat-

ed entities consciously caused a dilutive injury to the first-tier subsidiary, knowing that the impoverishment of the first-tier subsidiary would enable the diversion of value from the creditors of the first-tier subsidiary to a newly-formed affiliate of the parent. This scenario is far removed from situations where a parent and subsidiary are privileged to consult, such as when a parent expects that a solvent subsidiary will itself be better off if it commits an "efficient breach of a contract" and pays the injured party contractual damages. Here, the parent and the newly formed affiliate allegedly schemed with the first-tier subsidiary to implement a transaction that would render the first-tier subsidiary insolvent and unable to pay its bills by enabling the newly formed affiliate to dilute the first-tier subsidiary's indirect equity ownership of the third-tier subsidiary.

To preclude a conspiracy claim on the argument that the parent and the subsidiaries were one and the same person with identical objectives, and could not, as a matter of law, conspire, is not immediately convincing—especially when the parent is not offering to make the injured creditor whole using any of its assets or those held by the affiliates involved in the challenged transaction. The state of the briefing is such that I cannot confidently say that Delaware law should embrace a black-letter rule that wholly-owned affiliates of a parent entity cannot conspire with a parent. In other circumstances involving similar considerations—i.e., the questions of whether a parent can tortiously interfere with the contracts of its subsidiary or can aid and abet breaches of fiduciary duty by a subsidiary—our courts have refused to hold that the mere fact of common ownership requires treating the commonly-owned entities as a single legal person. Rather, to ensure that such entities may engage in the expected legitimate collabo-

ration, without subjecting each other to joint and several responsibility for any action taken after collaboration, our law has set a high bar that permits such claims to proceed only when facts are pled that suggest that the parent acted with scienter, in the sense that it knowingly assisted the affiliate in committing a wrongful act against another. Facts of that type have been pled here.

## II. *Factual Background*[1]

### A. *The Parties*

Sun I is a holding company that owns only one asset: a 100% equity interest in a single wholly-owned subsidiary, defendant GC–Sun Holdings II, L.P. ("Sun II"). Before the events described herein, Sun II, through various subsidiaries, operated a Canadian industrial supply business under the trade name Brafasco. Sun II was highly leveraged and owed a debt of approximately $37.5 million to Massachusetts Mutual Life Insurance Company and its affiliated entities (the "Mass Mutual Debt"). By 2002, Sun II was in default on the Mass Mutual Debt. Both Sun I and Sun II were insolvent at all times relevant to this case.

In May 2002, Allied's predecessor in interest, SunSub Holdings, LLC ("SunSub"), a former limited partner in Sun I, transferred its equity interest back to Sun I in exchange for a $10 million promissory note (the "$10 Million Note"), which was subordinated to the Mass Mutual Debt. As a result of this transaction, Sun I became a wholly-owned subsidiary of defendant Glencoe, an entity that is allegedly con-

trolled by defendant Glencoe Capital, LLC.[2] Glencoe exerted effective control over both Sun I and Sun II via its ownership of 100% of the limited partnership units of Sun I, and its ownership, directly or indirectly, of 100% of the stock of the general partners of Sun I and Sun II, defendants GC–Sun G.P., Inc. ("Sun I GP") and GC–Sun G.P. II, Inc. ("Sun II GP").

The $10 Million Note, which, by its terms, became due and payable immediately upon the payoff of the Mass Mutual Debt, was later transferred to Allied. The $10 Million Note contained a restrictive covenant, under which Sun I and its subsidiaries were prohibited from "incur[ring] any indebtedness for borrowed money [other than permitted indebtedness] to [Glencoe or its affiliates] . . . unless such indebtedness is subordinated to [the $10 Million Note]" (the "Insider Debt Restriction"). The $10 Million Note also contained a provision—a "Permitted Indebtedness Carve–Out"—that entitled Glencoe to make a $2 million debt investment in the Brafasco enterprise (the "Glencoe Permitted Debt") that would have a higher priority than the $10 Million Note. Glencoe exercised this right by loaning $2 million to Sun II at an interest rate of 30%—a rate that is very high, but explicitly permissible under the $10 Million Note. That high interest rate highlights Brafasco's undisputed financial distress.

Close attention to the complexity of the corporate structure behind the Brafasco enterprise is necessary to resolve this motion. To recap: Glencoe (the ultimate par-

---

**1.** The following facts, as required by Court of Chancery Rule 12(b)(6), are taken from Allied's complaint.

**2.** The pleadings are imprecise in describing the relationship between Glencoe Capital, LLC and Glencoe Capital Partners II, L.P., which I have defined as "Glencoe." The pre-

cise relationship between the two entities is not relevant for purposes of this motion. Therefore, to avoid adding to the confusion of the corporate structure described in this opinion, I refer to the two entities collectively as "Glencoe."

ent entity) owned 100% of Sun I's equity. Sun I owed a $10 million debt to Allied and owned 100% of Sun II's equity. Sun II owed $37.5 million in senior debt to Mass Mutual, as well as the $2 million Glencoe Permitted Debt, and owned, via various subsidiaries, the Brafasco assets. Because Sun I's claim on the Brafasco assets was through its equity interest in Sun II, the debt at the Sun I level (Allied's $10 Million Note) was structurally subordinated to both the Mass Mutual Debt and the Glencoe Permitted Debt.

Because Sun I owned 100% of the equity of Sun II, the entity that owned the Brafasco assets, Allied, as a creditor of Sun I, held an indirect claim on the full value of those assets. Its claim was third in line behind the Mass Mutual Debt and the Glencoe Permitted Debt. Thus, Allied alleges that to the extent the Brafasco assets were worth more than $39.5 million, it expected to recover that residual value up to the full amount of the $10 Million Note. Under the terms of the $10 Million Note, Allied expected this position to be protected by the Insider Debt Restriction such that any new money injected into the entities owning Brafasco would either be subordinate to Allied's claim, or would be provided by third-parties, and not affiliates of Glencoe, after arms-length negotiation, and would thus be fair to Allied and not jeopardize its ability to collect on the $10 Million Note.

### B. The Restructuring Transaction

By November 2004, Glencoe, Sun I, and Sun II had to restructure the Mass Mutual Debt. The resulting transaction (the "Restructuring") is the impetus for this lawsuit. Mass Mutual was demanding immediate payment of at least some of the accrued interest on the Mass Mutual Debt, and because Sun II had little cash, Sun I could not meet that demand without a new capital infusion. In other words, in order to prevent Mass Mutual from exercising its remedies as a creditor, the Brafasco enterprise needed to raise new capital. Allied does not dispute that this need was genuine. What it disputes is the method used to satisfy that exigency.

Glencoe looked to an affiliate to make the needed investment. In the Restructuring, Glencoe and its affiliates were necessarily confronted with the $10 Million Note's Insider Debt Restriction, and they took care not to offend its literal language. Sun II contributed the Brafasco operating assets to a newly-formed entity, defendant Brafasco Holdings II, Inc. ("BH II") in exchange for 25% of the equity in that entity. Simultaneously, Glencoe and its affiliates formed another new entity, defendant GC–Sun Frontier Investors, LLC ("Investors"), to contribute $5 million to BH II in return for the other 75% of BH II's equity (the "Equity Investment").[3] As part of the Restructuring, BH II assumed the Mass Mutual Debt owed by Sun II. The $5 million cash contribution and some other cash was paid directly to Mass Mutual, and Mass Mutual also took a preferred stock interest in BH II. The end result was that Mass Mutual now had a claim of approximately $25 million against BH II's assets, and Investors and Sun II shared whatever was left 75%–25%. Sun II's 25% share would go first to pay the Glencoe Permitted Debt and various ad-

---

3. The pleadings are not entirely clear on the precise nature of the relationship between Investors and Glencoe. Without the benefit of discovery, Allied has been unable to determine the precise identity of Investors' shareholders. The defendants do not dispute that Investors is an "affiliate" of Glencoe or that the Insider Debt Restriction would prohibit Sun I or its subsidiaries from incurring any indebtedness for borrowed money to Investors.

ministrative and management fees. Whatever was then left, if anything, would go to Sun I to pay Allied on the $10 Million Note.

In structuring this transaction, Glencoe and its affiliates did with equity what they were explicitly not permitted to do with "indebtedness for borrowed money"—they made an investment in the Brafasco enterprise that was not subordinated to the $10 Million Note. Although Investors bought equity, which is generally thought of as having a lower liquidation priority than debt, the Equity Investment was made at Sun I's third-tier subsidiary, BH II. As a result, Investors, who now owned 75% of BH II's equity, was on the same level as Sun I, to which Allied had to look for payment on the $10 Million Note. But Sun I now had only an indirect 25% equity interest in BH II.[4] In Allied's simplified terms, Allied went from having a $10 million claim on 100% of the residual value of the Brafasco assets to having a claim on only 25% of that value. Investors—an affiliate of Glencoe—acquired the other 75% for $5 million.

What Allied finds most problematic about the Equity Investment is that it was not the product of arms-length bargaining. Glencoe, by virtue of its control over Sun I and Sun II was bargaining with itself, and could have given its affiliate, Investors, as big or as little a share of BH II's equity as it wanted. Allied, who, before the Restructuring, held the residual claim on the Brafasco assets, had no voice during the negotiations and no representation in Sun I or Sun II's management. Allied claims that this conflict of interest resulted in Investors not giving reasonably equivalent value in exchange for the 75% equity interest in BH II that it acquired. In other words, Allied contends that 75% of BH II's equity was worth far more than $5 million at the time of the Restructuring. Allied claims that, as a result, the Restructuring was an unfair self-dealing transaction that was specifically designed to harm Sun II, and its parent Sun I, so that Glencoe and its affiliates could usurp the residual value of the Brafasco business without paying anything to Allied, who could only look to Sun I, now stripped of all valuable assets, to collect on the $10 Million Note.

## C. The Home Depot Transaction

As it turns out, Investors, in fact, made themselves a mighty fine investment. On June 30, 2005, only six months after the Restructuring, the Brafasco business was sold to Home Depot (the "Home Depot Transaction") for a total purchase price of approximately $50 million,[5] subject to a holdback of about $12.75 million.[6]

At closing, the Mass Mutual Debt was paid in full, and assuming Home Depot pays the entire holdback amount, that leaves $25 million to be split 75%–25%

4. The Equity Investment would have shared equal priority with the $10 Million Note even if Investors had contributed the $5 million to Sun II in return for an equity interest in Sun II. It appears that Sun II dropped the Brafasco assets down to the lower level BH II subsidiary so that the new investment would take priority over the Glencoe Permitted Debt, which was at the Sun II level.

5. The Home Depot Transaction was done in Canadian dollars. The exact purchase price was CDN $59,450,000 with a CDN $15,000,000 holdback. The conversion ratio

from Canadian to American dollars fluctuated from about .81 to .89 during the time periods relevant to the transaction. For purposes of this opinion, I have split the difference and assumed a constant conversion ratio of .85. As a result, the numbers used herein are very rough approximations, but are sufficiently accurate for purposes of this opinion.

6. The holdback amount was to be dispersed in two approximately equal amounts on the first and second anniversaries of the June 30, 2005 closing date.

between Investors and Sun II. Investors doubled its money in six months, and will nearly double it again when the final hold-back payment is received. Meanwhile, after Sun II repays the Glencoe Permitted Debt (with accrued interest at 30%), and the management and administrative fees, little, if anything, will be left of the cash that came to it as its 25% share of the Home Depot Transaction proceeds. Thus, Sun II will have trivial funds to pay up to Sun I. As a result, Allied expects to recover only pennies on the dollar of the $10 Million Note.

### III. The Counts In Allied's Complaint That Are Under Attack As Facially Deficient

The motion to dismiss challenges four counts in Allied's complaint. Count II seeks recovery under the express terms of the $10 Million Note. Count III argues that the form of the Restructuring breached the implied covenant of good faith and fair dealing in the $10 Million Note. Count IV asserts a related tortious interference with contract claim. Count VIII alleges a civil conspiracy among the myriad of Glencoe affiliated entities involved in the Restructuring.

The first two challenged counts actually assert an identical argument. Count II alleges that the fact that Glencoe's affiliate, Investors, made the Equity Investment in the Brafasco enterprise that shared equal priority with the $10 Million Note violated the express terms of the $10 Million Note's Insider Debt Restriction. As will be seen, that contention is obviously wrong and therefore Allied buttresses it by arguing that because the Equity Investment in BH II had, in Allied's view, the same subordinating effect as a loan of money to Sun I, the Equity Investment was therefore forbidden by the Insider Debt Restriction. In other words, Allied is premising its argument that the Equity Investment breached the literal terms of the Insider Debt Restriction on the notion that the literal terms implicitly incorporated other terms. Properly conceived, this argument is therefore identical to that made in Count III of the complaint, which argues that the Equity Investment violated the implied covenant of good faith and fair dealing in the $10 Million Note by offending the goal and spirit of the Insider Debt Restriction, which Allied claims was to prevent Glencoe or its affiliates from making any investment at all in the Brafasco enterprise that was not subordinate to the $10 Million Note. Count IV, which claims tortious interference against all of the entities other than Sun I, is based on the same argument. That count's viability turns in the first instance on whether Allied has pled a breach of contract claim.

The other counts in Allied's complaint are not contractual and all have their essence in the contention that Glencoe knew that the Restructuring was not fair to Allied. They involve allegations that Glencoe intentionally enriched itself, through its affiliate, Investors, at Allied's expense by making a fraudulent and unfair transfer of the BH II equity to Investors (1) with the purpose of rendering Sun I unable to pay the $10 Million Note, and (2) in disregard of the fiduciary duties of care and loyalty that Allied was owed by virtue of its position as a creditor of an insolvent Delaware entity, Sun I.

As one of these non-contractual claims, Allied asserts, as Count VIII, a civil conspiracy cause of action, alleging that Glencoe, its subsidiaries and affiliates, and the officers and directors of Sun I and Sun II (whose identities are allegedly unknown to Allied, and, as a result, are identified as John Does 1–10 in Allied's complaint) all acted in concert and agreed upon a malevolent plan to enrich themselves at Allied's expense. This is the only non-contractual cause of action that the defendants have moved to dismiss.

I will address the challenges to the complaint in the following order. Initially, I will analyze whether the complaint states a claim for breach of, or tortious interference with, the Insider Debt Restriction in the $10 Million Note. Then, I will examine whether the civil conspiracy count in the complaint is viable.

## IV. *The Procedural Standard*

The defendants' motion to dismiss for failure to state a claim is governed by the familiar Rule 12(b)(6) standard, which requires me to accept all well-pled allegations of fact as true and draw all reasonable inferences in Allied's favor.[7] I need not, however, accept as true conclusory assertions unsupported by specific factual allegations.[8] If, after these principles are applied, I conclude that the facts fail to support a cause of action, the motion to dismiss must be granted.[9]

## V. *Does The Complaint State A Claim For Breach Of The $10 Million Note?*

### A. *The Governing Principles Of Contract Interpretation*

■ Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language.[10] When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning.[11] Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.[12]

■ In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning.[13] Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it.[14] When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented.[15] By such judicial action, the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements.[16]

### B. *Allied's Express Contract Claim*

■ Despite the $10 Million Note's failure to restrict any equity investments by

7. *E.g., In re Lukens, Inc. Shareholders Litig.,* 757 A.2d 720, 727 (Del.Ch.1999).

8. *E.g., H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 139 (Del.Ch.2003).

9. *E.g., Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

10. *E.g., OSI Systems, Inc. v. Instrumentarium Corp.,* 892 A.2d 1086, 1090 (Del.Ch.2006).

11. *E.g., Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992).

12. *E.g., Citadel Holding Corp., v. Roven,* 603 A.2d 818, 822 (Del.1992); *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997).

13. *E.g., Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006).

14. *Id.*

15. *Id.*

16. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir.1982) (noting that creating uncertainty with respect to the meaning of ordinary contract provisions decreases the inherent value of similar contracts).

Glencoe or its affiliates in Sun I or its subsidiaries, Allied initially contends that the Restructuring violated the express terms of the $10 Million Note because it involved an investment by a Glencoe affiliate that shared equal priority with the $10 Million Note. But, as noted above, the Insider Debt Restriction only prohibited Sun I or its subsidiaries from incurring any "indebtedness for borrowed money" to Glencoe or its affiliates. Allied's argument that the Equity Investment violated the express terms of the $10 Million Note is, therefore, frivolous.

Allied does not base its argument on any reasonable interpretation of the contract language. Rather, Allied falls back on what it asserts is a basic principle of capital structuring—that debt naturally takes liquidation priority over equity. Allied contends that because the $10 Million Note prohibited an unsubordinated debt investment in Sun I or its subsidiaries, it must also have prohibited the unsubordinated Equity Investment because equity by its very nature has a lower priority than debt. Allied argues that if debt provided by Investors could not share priority with the $10 Million Note, the Equity Investment should not be able to either. It claims that to interpret the Insider Debt Restriction otherwise would render it meaningless because such interpretation would too easily allow Glencoe to avoid the restriction but still accomplish the prohibited result by

doing just what it did—making the new Equity Investment in a downstream subsidiary.

But by relying on one fundamental difference between debt and equity to bolster its argument, Allied merely highlights that debt and equity are, as a general matter, two distinct concepts. Allied's argument boils down to the assertion that when the parties to the $10 Million Note used the words "indebtedness for borrowed money," they meant to preclude both debt and garden variety equity investments. That argument is, to put it mildly, unconvincing. Admittedly, at the edges, it can be difficult in some cases to distinguish between a loan of money and an equity investment. The ingenuity of the marketplace and the flexibility afforded by the Delaware General Corporation Law have given rise to a variety of investment securities that blur the line between debt and equity. But this does not mean that equity and debt do not remain importantly distinct categories.[17] Here, the Equity Investment was well clear of any blurry part of the border between the categories. Investors contributed $5 Million to BH II and took back plain vanilla common equity—not debt.

The words "indebtedness for borrowed money" are clear and unambiguous terms that must be interpreted according to their ordinary and usual meaning.[18] Allied's contention—that the Insider Debt Restric-

17. For example, with respect to voting rights, the General Corporation Law provides that unless the certificate of incorporation provides otherwise, a stockholder is entitled to one vote for each share that he holds, even if that "stock" has substantial debt-like qualities. 8 *Del. C.* § 212. By contrast, a debt holder has no voting rights unless the certificate of incorporation expressly provides for them. 8 *Del. C.* § 221; *see also Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broadcasting Corp.*, 906 A.2d 218, 224–25 (Del.Ch.2006) (illustrating that the distinction between a debt and equity investment is

meaningful and holding that mandatorily redeemable preferred stock was equity rather than debt, and thus a holder of the "stock" did not have standing to bring claims as a "creditor" of the issuer); *Cede & Co. v. JRC Acquisition Corp.*, 2004 WL 286963 at *7 (Del. Ch.2004) (discussing debt-to-equity ratio, a concept that would be nonsensical if there were no distinction between debt and equity).

18. *E.g., Lorillard Tobacco Co.*, 903 A.2d at 739.

tion was concerned not with the type of investment that was prohibited but with the priority of the investment—is belied by the specificity with which the provision describes the prohibited investment. "[I]ndebtedness for borrowed money" simply does not connote an "equity investment." I cannot twist and torture the unambiguous terms of the $10 Million Note under the guise of construing them to give Allied a right for which it did not bargain.[19] Accordingly, I hold that the Equity Investment complied with the express terms of the $10 Million Note, and dismiss Count II for failure to state a claim.

### C. Allied's Implied Covenant Claim

██ Allied next contends that even if the Restructuring did not offend the express terms of the $10 Million Note, it violated the implied covenant of good faith and fair dealing by frustrating Allied's reasonable commercial expectation that Glencoe and its affiliates would not make any investment in the Brafasco enterprise that had priority over the $10 Million Note.[20] Allied admits that Delaware courts apply the implied covenant rarely, and only in narrow circumstances.[21] It asserts, however, that enforcement of the implied covenant is necessary here to protect it from the defendants' intentional evasion of the Insider Debt Restriction, and to ensure that it receives the "fruits of its bargain"— which Allied claims include preventing Glencoe from creating a transaction structure in which it had the potential to self-deal.

██ The implied covenant of good faith and fair dealing embodies the law's expectation that "each party to a contract will act with good faith toward the other with respect to the subject matter of the contract."[22] Delaware jurisprudence on the implied covenant has, from time to time, stated the test thusly: "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to the matter"?[23]

██ Courts must be careful however not to overestimate the circumstances when it is appropriate to employ this intrinsically counterfactual and hindsight-bias prone test. When Chancellor Allen formulated it in *Oak Industries,* he did not intend to alter the fundamental rule of contract interpretation that Delaware courts will not look to extrinsic circumstances to ascertain the meaning of unambiguous contract language that covers a topic. Instead, implied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that

---

19. *See id.*

20. *See Cincinnati SMSA, Ltd. Partnership v. Cincinnati Bell Cellular Systems Co.,* 708 A.2d 989, 992 (Del.1998) (noting that occasionally it is necessary for a court to imply terms into an agreement so as to honor the parties reasonable commercial expectations).

21. *See id.* (explaining that application of the implied covenant "should be rare and fact-intensive, turning on issues of compelling fairness").

22. *Katz v. Oak Industries, Inc.,* 508 A.2d 873, 880 (Del.Ch.1986).

23. *Id.; see also Moore Business Forms, Inc. v. Cordant Holdings Corp.,* 1995 WL 662685 (Del.Ch.1995) ("implied contractual obligations are terms that 'clearly would have been included [in the contract] had the parties negotiated with respect to them' ") (quoting *Price Organization, Inc. v. Universal Computer Consulting, Inc.,* 1993 WL 400152, at *6 (Del.Ch.1993)).

the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them.[24] Chancellor Allen's own jurisprudence makes this clear by emphasizing that courts will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process.[25]

Here, Allied argues that because the $10 Million Note is silent as to Glencoe's ability to make the unsubordinated Equity Investment in Sun I or its subsidiaries, we must attempt to ascertain what the intent of the original parties might have been had they thought to negotiate over the matter. Allied claims that because the parties explicitly prohibited an unsubordinated debt investment in Sun I or it subsidiaries, they clearly would also have prohibited the unsubordinated Equity Investment had they

thought to address that issue because equity is generally thought of as being subordinate to debt.

Allied's approach to contractual interpretation is the polar opposite of that required by Delaware law. Under our law, the fact that two parties to a contract explicitly restricted a particular type of investment—"indebtedness for borrowed money"—by a parent or its affiliates, not only in the issuer, Sun I, but in any subsidiary of the issuer, implies, by omission, that the controller was free to make equity investments in the issuer or the issuer's subsidiaries. Why? For starters, the highly-negotiated provisions of notes and debentures that restrict the commercial freedom that issuers otherwise enjoy under default law are traditionally interpreted strictly, precisely because they involve specifically extracted limitations on ordinary economic liberties.[26] That a note restricts

24. At oral argument, Allied argued that if the court determined that the contract language itself did not prohibit the Equity Investment made by Investors, the implied covenant required that Allied be permitted to take discovery into the actual intent of the parties in drafting the Insider Debt Restriction. Such a proposition misunderstands the relevant inquiry. The test is whether it is clear *from what was expressly agreed upon* that the parties meant to prohibit the conduct at issue. As with any analysis of a breach of contract claim, the implied covenant inquiry initially focuses on the four corners of the contact itself, and parol evidence is only admissible once an ambiguity arises from the text. To allow discovery into the intent of the original parties to the $10 Million Note would be to ignore the teachings of cases like *Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992), and gut the parol evidence rule.

25. *See, e.g., Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 1988 WL 63491, at *8 (Del.Ch. 1988) (noting that where "a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obli-

gation of a different kind that has been breached") (Allen, C.).

26. *See Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1515 (S.D.N.Y.1989) (noting that ordinary negative covenants in a bond indenture are strictly construed according to their terms because uniformity of interpretation is required for the efficient working of capital markets); *Automodular Assemblies (DE), Inc. v. PNC Bank, Delaware*, 2004 WL 1859828, at *7 n. 7 (Del. Ch.2004) (stating with respect to a financial covenant in a loan agreement: "For a [party] to rely upon the plain language of the contractual protections it has extracted is no violation of any implied term; to find otherwise would be to supplant the plain language of the agreement. Our law does not permit the use of the implied covenant of good faith for this purpose."); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp. 1529, 1541–42 (S.D.N.Y.1983) (choosing the narrower of two possible interpretations of a protective covenant in a bond indenture); *see also* Houman B. Shadab, Note, *Interpreting Indentures: How Disequilibrium Economics and Financial Asset Specificity Support Nar-*

a highly specific form of investment does not mean that the parties were using that form as an exemplar to illustrate a capacious range of like conduct that was impliedly precluded, and discoverable by use of a thesaurus. The use of a precise term does not imply a "gap," but instead explicitly indicates that the parties were proceeding carefully to only delimit the issuer's freedom in a discrete manner. When a note is written in such a manner, as is the case here, there is no role for the judiciary to imply other terms.

The express terms of the Insider Debt Restriction illustrate why that is properly the case. Although Allied claims to be shocked by the Equity Investment, its surprise bespeaks a faux naivete. Remember that the Insider Debt Restriction did not simply limit the ability of Glencoe and its affiliates to make debt investments in Sun I. By its plain terms, the Insider Debt Restriction also prohibited Glencoe and its affiliates from making a debt investment at any subsidiary of Sun I. That is, Allied clearly recognized that if Glencoe loaned money that was secured by the assets of a Sun I subsidiary, it could find the $10 Million Note subordinated. Yet, it now claims that it somehow did not realize that there was the potential that an equity investment made in one of Sun I's subsidiaries could have the effect of reducing Sun I's ownership of those subsidiaries in a manner that might affect Allied's ability to collect on the $10 Million Note. Even if that implausible contention is correct, it

does not aid Allied. The unambiguous terms of the Insider Debt Restriction plainly provide only for a very specific limitation on Glencoe's ability to infuse capital into Sun I or its subsidiaries—a limitation only on "indebtedness for borrowed money." Any reasonable contracting party would have recognized that such a discrete limitation on a particular type of investment that applied to Sun I and its subsidiaries would not have the effect of impliedly precluding other types of investments in those entities.

▇▇▇▇ Contrary to Allied's argument, it is by no means absurd to think that the parties who negotiated the terms of the $10 Million Note might distinguish between equity investments and loans.[27] But even if it were, speculation on the intention of the original parties is only appropriate when a contract is silent with respect to the subject matter at issue. Here, the parties directly addressed Glencoe's ability to make future investments in the Brafasco enterprise and specifically prohibited only unsubordinated debt investments. Application of the implied covenant of good faith and fair dealing to add to the explicit restrictions of a promissory note is not proper under our law because the restrictive covenants between debtors and creditors define, by omission, the freedom of action that the debtor retains. The $10 Million Note expressly contemplated the need to restructure the Mass Mutual

*row Interpretation*, 75 S. Cal. L.Rev. 763, 782–83 (noting that protective covenants in bond indentures are typically interpreted to govern as little conduct as possible, and arguing that such an approach is most conducive to entrepreneurial behavior and, therefore, wealth creation).

27. For example, debt investors, but not equity investors, have affirmative legal rights to enforce remedies against the assets of a business. *See* R. Franklin Balotti & Jesse A. Fin-

klestein, The Delaware Law of Corporations & Business Organizations § 5.2 (3d ed. 2006). The parties may have wanted to prevent Glencoe from being able to exercise those creditors' rights unless the rights were subordinate to the $10 Million Note. This concern would not exist with respect to an equity investment because an equity investor has no right to enforce any claim against the assets of the business. *See id.*

Debt.[28] To sustain Allied's implied covenant claim would narrow the contractual freedom left open to Glencoe and the Sun entities in structuring a transaction that all of the parties knew could occur. The form of judicial reformation Allied seeks does not implement any clear interstitial intent discernible from the language in the $10 Million Note, but instead grants Allied additional contractual protections that the original noteholder, SunSub, plainly did not extract through negotiation.[29]

◼ Furthermore, courts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.[30] The original parties to the $10 Million Note were sophisticated players who had experience in negotiating the particulars of a debtor-creditor relationship. At oral argument, Allied conceded the obvious: that SunSub, the original creditor on the $10 Million Note, used a large law firm to negotiate the detailed 15–page single-spaced promissory note. Had SunSub wanted a protection against insider equity investments, it easily could have (and should have) suggested that language to that effect be added to the $10 Million Note to see whether and on what terms

Glencoe would accede to that additional restriction on its freedom to further capitalize the cash-strapped Brafasco business. SunSub failed to extract anything other than a discrete limitation that does not apply to equity investments. Allied cannot use the implied covenant of good faith and fair dealing to avoid the consequences of the plain language of the contract.[31] The implied covenant is not a fall-back position to be argued when you now wish your predecessor-in-interest had done a better job of negotiating the contract in the first place.

Finally, it bears mentioning that the failure of the $10 Million Note to preclude the Equity Investment did not render Allied entirely without protection. Given the fiduciary relationship Glencoe bore to Sun I, and given the statutory prohibitions against fraudulent transfers, the mere fact that Glencoe was under no contractual inhibition from making equity investments in Sun I and its subsidiaries did not grant it a license to do so on terms that were unfair to Sun I, to the detriment of Sun I's creditors. Rather, by making such an investment, Glencoe placed itself in the precarious circumstance of facing potential lia-

---

28. The note provides that "[t]he holders of Senior Indebtedness may extend, renew, modify, restate or amend the terms of Senior Indebtedness or any security therefor, in accordance with the terms hereof, and release, sell or exchange such security and otherwise deal freely with Maker or any of its subsidiaries, all without affecting the liabilities and obligations of Maker or Holder."

29. *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del.Ch.2004); *see also Moore Business Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *8 (Del. Ch.1995) (" '[C]ourts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong,' yet does not provide for the obligation that is claimed to arise by implication.") (quoting *Abex, Inc. v. Koll Real Estate*

*Group, Inc.*, 1994 WL 728827, at *12 (Del.Ch. 1994)).

30. *Harris Trust and Savings Bank v. E–II Holdings, Inc.*, 926 F.2d 636, 644 (7th Cir. 1991) ("Implying the covenant requested by the Trustees would also be 'troublesome' in view of the fact that the Indentures could easily have been drafted to incorporate expressly the terms the Trustees now urge this court to imply.")(internal quotations omitted).

31. *See Metropolitan Life Insurance Co.*, 716 F.Supp. at 1517 ("[A]n implied covenant derives its substance directly from the language of the Indenture, and cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture.") (internal quotations omitted).

bility for breach of fiduciary duty or a fraudulent transfer, especially given Sun I's shaky finances and Glencoe's control over it. Allied's non-contractual claims illustrate that the absence of a flat contractual prohibition on equity investments by Glencoe in Sun I and its subsidiaries did not render Allied defenseless. Given this reality, it is by no means absurd to think that the parties to the $10 Million Note would have left Glencoe's right to make equity investments contractually unrestricted because these other legal strictures would serve to create an incentive for Glencoe to do so only on terms that were fair to Sun I and its subsidiaries.

Allied admits that the Brafasco enterprise had no choice other than to address Mass Mutual's demand for some form of payment, lest Mass Mutual simply foreclose on all of Brafasco's assets. Investors put $5 million in new funds at risk to help stave off immediate foreclosure. That the Restructuring was implemented in a contractually unrestricted way that gave Investors 75% of BH II's equity and Sun I only 25% is not unconscionable in itself. The question of whether Glencoe acted inappropriately really depends on the economics of the Equity Investment: was $5 million a fair payment for 75% of BH II's equity?

Allied has a chance to pursue claims that are based on a negative answer to that question. What it is not free to do is to press a claim that the $10 Million Note explicitly or impliedly barred the Equity Investment.

### D. Allied's Tortious Interference Claim

■ Allied asserts a tortious interference with contract claim against all of the defendants other than Sun I, the debtor on the $10 Million Note, alleging that, by directing and/or participating in the Restructuring, they wrongfully induced Sun I to breach its contractual obligations. To state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract.[32] Because Allied has not done so, its tortious interference claim fails.

### VI. Has Allied Pled A Civil Conspiracy Claim?

In Count VIII, Allied attempts to set forth a claim for civil conspiracy. Named in that count are a myriad of Glencoe-controlled affiliates as well as the "John Does" who served as those entities' directors and officers. The defendants have moved to dismiss this count for failure to state a claim upon which relief can be granted.

■ Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.[33] The benefit to a plaintiff of establishing a civil conspiracy claim is that all conspirators will be vicariously liable for the acts of co-conspirators in furtherance of the conspiracy.[34] Allied contends that all of the Glencoe affiliates

---

32. See Goldman v. Pogo.com, Inc., 2002 WL 1358760, at *4 (Del.Ch.2002) ("A claim of tortious interference with a contractual right requires [among other things] ... a contract, a breach of that contract, and an injury."); Boyer v. Wilmington Materials, 1997 WL 382979, at *10 (Del.Ch.1997) ("The court has not found that the shareholders' agreement was breached, so there is no breach of con-

tract upon which to ground the tortious interference claim.").

33. Nicolet, Inc. v. Nutt, 525 A.2d 146, 149–50 (Del.1987).

34. Laventhol, Krekstein, Horwath Horwath v. Tuckman, 372 A.2d 168, 170 (Del.1976).

in this case acted in concert to implement a malevolent plan (the Restructuring) to usurp the value of the Brafasco business for the benefit of Investors and at Allied's expense. Allied claims that all of the affiliated entities are culpable, and all should be held accountable for the harm the Restructuring caused to Allied.

■ For starters, I grant the defendants' motion to the extent it contends that the complaint fails to state a conspiracy claim against the unidentified John Does. Allied has no idea who the directors and officers are or what they did. Had Allied simply indicated in the complaint that it sought to hold individuals responsible at some later date when it identified who they were and what they did, that might have been acceptable. It cannot pretend, however, that its complaint actually alleges facts supporting a conspiracy claim against the unknown when the complaint is entirely devoid of facts regarding the role of particular individuals, even by title.[35]

With that distraction to the side, I dig into the main issue presented by this aspect of the defendants' motion, which is largely based on one central and simple argument: the defendants contend that Delaware law does not permit the prosecution of a civil conspiracy claim against business entities under common control. In particular, they argue that a parent entity cannot, as a matter of law, conspire with its wholly-owned subsidiary.

By this argument, the defendants would have me render a bright-line ruling in an area of American jurisprudence that, both inside and outside of Delaware, is more characterized by confusion than clarity.[36] Not only that, the defendants do not offer up briefing on this issue anywhere close in seriousness and depth to provide confidence that a ruling in their favor on this issue is justified.

I refuse to use this motion as a basis for holding that, as a per se matter, commonly-controlled or even owned business entities cannot conspire with one another and be held liable for acting in concert to pursue unlawful activity that causes damage.[37]

**35.** My decision to dismiss the civil conspiracy claims against the John Doe defendants is in accord with the decisions of other jurisdictions, which have held that such allegations cannot withstand a motion to dismiss when the complaint does not attempt to describe the role the John Does played in the conspiracy. *See Morris v. First Union National Bank,* 2002 WL 47961, at *6 (E.D.Pa.2002) (dismissing a civil conspiracy claim against John Doe defendants for failure to allege sufficient facts); *Southwest Materials Handling Co. v. Nissan Motor Co., Ltd.,* 2000 WL 1664160, at *6 (N.D.Tex.2000) (stating with respect to civil conspiracy allegations against John Doe defendants: "This Court is not in the position of channeling or divining potential co-conspirators who are presently as tangible as Santa Claus, the Easter [B]unny or the Tooth Fairy").

**36.** *Compare* Thomas J. Leach, *Civil Conspiracy: What's The Use?,* 54 U. Miami L.Rev. 1, 1 (1999) (suggesting that for all its doctrinal complexity, civil conspiracy is useful in relatively few circumstances) *with* Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule,* 84 Neb. L.Rev. 1, 3 (2005) (suggesting that civil conspiracy can be a potent and socially useful weapon in a plaintiff's arsenal, but that courts have yet to delineate a coherent, principled approach to applying the doctrine in an intra-corporate context).

**37.** To the extent that a prior decision of this court has previously held that a parent is incapable of conspiring with its wholly-owned subsidiary, *see Akande v. Transamerica Airlines, Inc.,* 2006 WL 587846, at *6–7 (Del.Ch. 2006), I respectfully disagree. In *Akande,* the court devoted little attention to the question, which came up in a motion to dismiss what the court seemed to regard as a very weak pleading. *Akande,* which is the only instance in which this court has addressed this issue, cites *Amaysing Tech. Corp. v. Cyberair Communications, Inc.,* 2005 WL 578972, at *7

Although I could, as seasoned readers of this court's opinions know, spend fifty pages explaining why, I will do so more tersely and only return to the issue in later stages of the case if it becomes essential and if the defendants devote more attention to the issue.

█ As an initial matter, I note that Delaware law has, in analogous areas, refused to hold that commonly-owned entities cannot be subject to other common law causes of action that recognize their separate legal dignity. This, of course, should be of little surprise given that our corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control.[38]

█ Therefore, it is uncontroversial for parent corporations to be subjected to claims for aiding and abetting breaches of fiduciary duty committed by directors of their subsidiaries.[39] In fact, this court has, on facts very similar to those in this case, held an affiliate of a limited partnership's general partner liable for aiding and abetting the general partner's breach of fiduciary duty by doing just what Investors did here—participating in a transaction that enriched the affiliate at the expense of the partnership.[40]

█ Indeed, our state courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.[41] Like

(Del.Ch.2005), which held that a corporation is incapable of conspiring with its officers and directors, in support of its conclusion. But, as I discuss later in n. 64, the question presented by *Amaysing Tech.* is different from the question presented in *Akande* and in this case. Moreover, to the extent that, in cases like *Amaysing Tech.*, courts respect the separate legal dignity of the corporation by disallowing claims that corporate managers conspired among themselves and with their corporate employer, consistency counsels in favor of respecting the presumptive separateness of parent and subsidiary in examining whether those entities can conspire. Bright minds have looked at these issues and their failure to come up with clearly persuasive approaches to addressing them suggests that the problems raised are not simple ones. An invariable parent-subsidiary privilege to conspire is not the generally accepted rule that *Akande* described it to be. *See Outdoor Tech., Inc. v. Allfirst Financial, Inc.,* 2000 WL 141275, at *6 (Del.Super.2000) (noting that Delaware law had yet to address the issue, and refusing to hold that a parent cannot conspire with its subsidiary).

38. *See, e.g., Stauffer v. Standard Brands, Inc.,* 178 A.2d 311, 316 (Del.Ch.1962) ("In the absence of fraud, the separate entity of a corporation is to be recognized.").

39. *See, e.g., Universal Studios, Inc. v. Viacom, Inc.,* 705 A.2d 579 (Del.Ch.1997) (parent held liable for aiding and abetting its wholly-owned subsidiary's fiduciary breach).

40. *In re Nantucket Island Associates, Ltd. Partnership Unitholders Litig.,* 810 A.2d 351 (Del. Ch.2002). In *Nantucket,* the plaintiffs alleged that the general partner concocted a scheme whereby it deceived the limited partners into allowing a new entity formed by, and affiliated with, the general partner to make an unfairly favorable preferred equity investment in the partnership, which had the effect of usurping the partnership's value for the benefit of the new affiliate and at the limited partners' expense. On those facts, this court had no difficulty concluding that the plaintiffs had properly alleged the affiliate's knowing participation in the general partner's deception, and that they had pled a valid cause of action against the affiliate for aiding and abetting breach of fiduciary duty. *Id.* at 375–76.

41. *See Weinberger v. Rio Grande Industries, Inc.,* 519 A.2d 116, 131 (Del.Ch.1986) (stating that a claim for civil conspiracy involving breaches of fiduciary duty is sometimes called "aiding and abetting"); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984) (defining a civil conspiracy claim using the traditional elements associated with aiding and abetting

the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter—a plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the non-fiduciary.[42] In this case, Allied has pled an aiding and abetting claim against all defendants other than Sun I GP and that entity's officers and directors (against whom they have pled simple breach of fiduciary duty claims). The defendants have not moved to dismiss the aiding and abetting claim. The functional identity of that claim and the conspiracy claim render this motion therefore almost without real-world purpose. But for now, the more important point is that this state's acceptance of claims for aiding and abetting breaches of fiduciary duty brought against parent corporations and their affiliates, including subsidiaries, belies any outright rejection of the proposition that wholly-owned and/or commonly-controlled entities cannot be held responsible for each other's acts when those acts result from concerted unlawful activity.

Another body of analogous Delaware law also undercuts the defendants' argument. In *Shearin v. E.F. Hutton Group, Inc.,*[43] Chancellor Allen held that a parent corporation can be held liable for tortious-ly interfering with its subsidiaries' contracts when a plaintiff proves that the parent was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises.[44] In so holding, Chancellor Allen acknowledged that the test for holding a parent corporation liable for tortious interference had to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases. He also feared that the option of efficient breach—the conscious decision to breach a contract and pay the required damages because of the potential for profit even after the payment of those damages—would be chilled by holding the parent responsible in tort. For these reasons, Chancellor Allen indicated that plaintiffs could only hold a parent corporation liable for tortious interference under a stringent bad faith standard. At the same time, he rejected a flat-out prohibition on such a theory, noting that to adopt such a rule would be inconsistent with Delaware law's recognition of the presumptively separate legal dignities of parent and subsidiary.[45]

In this case, there is no doubt that the complaint pleads facts that satisfy not only the accepted test for civil conspiracy,[46] but also the test for aiding and abet-

---

breach of fiduciary duty), *aff'd,* 575 A.2d 1131 (Del.1990); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* 1995 WL 694397, at *15 n. 11 (Del.1995) (noting that this court has analyzed the knowing participation requirement of aiding and abetting breach of fiduciary duty by reference to the elements of a civil conspiracy claim); *Malpiede v. Townson,* 780 A.2d 1075, 1098 n. 82 (Del.2001) (stating, in a breach of fiduciary duty case, that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here").

42. *In re Santa Fe Pacific Corp. Shareholder Litig.,* 669 A.2d 59, 72 (Del.1995).

43. 652 A.2d 578 (Del.Ch.1994).

44. *Id.* at 591.

45. *Id.* at 590 n. 13 (explaining that the limited privilege for contractual consultation is "more consistent with the traditional respect accorded to the corporate form by Delaware law," and that "it does not ignore that a parent and subsidiary are separate entities").

46. In a separate argument, the defendants contend that even if Allied's civil conspiracy claim is not barred by the defendants' corporate relatedness, Allied has failed to plead its

ting a breach of fiduciary duty and the bad faith standard articulated in *Shearin.* Glencoe is alleged to have caused Sun II to drop all of its operating assets down to BH II, and to have caused Sun I to assent to accept only an indirect 25% equity interest in BH II, for the express purpose of enabling Glencoe, through its newly-formed affiliate, Investors, to obtain 75% of BH II's equity at an unfairly low price. By this means, Sun I was, it is alleged, intentionally rendered unable to repay the $10 Million Note, while Investors stood to reap an unreasonably high return on the Equity Investment. Put simply, Glencoe is alleged to have purposely injured Sun I and Sun II so as to enable Glencoe's newly-created affiliate, Investors, to reap gain. Sun I, Sun II, and their general partner entities stood in a position to prevent the unfair Equity Investment, but, ignoring the obligations owed to Allied, instead facilitated it. By injuring Sun I, Glencoe and the affiliates who participated and acquiesced in the Restructuring injured Allied, Sun I's creditor.

This scenario is widely divergent from those commonly used to exemplify a legitimate concern about applying conspiracy doctrine to commonly-controlled entities. The bona fide concern is that every breach of contract, tort or other case involving a controlled subsidiary will become a vehicle to sue controllers. Where the decision to cause a subsidiary to act in a certain manner originated at the parent level, plaintiffs would often be able to contend that the parent and subsidiary acted in concert with one another, and that the parent should be vicariously liable for the subsidiary's acts. That would increase litigation costs and deter the use of subsidiaries, even when there is a legitimate purpose for doing so and there is no wrong to others in being forced to look only to the subsidiary for relief. But the examples often pointed to as "privileging" concerted activity between wholly-owned entities

claim with the particularity required by Court of Chancery Rule 9(b). I question the extent to which Rule 9(b), which applies a heightened pleading standard for claims involving fraud, is applicable to claims of civil conspiracy not involving fraud. *See* 5 Charles A. Wright, Arthur R. Miller, Federal Practice And Procedure § 1233 (3d ed. 2004) ("The pleadings in a civil action for conspiracy must comply with the general requirement in Federal Rule 8 that the complaint contain a direct, simple, and concise statement that demonstrates the pleader is entitled to relief."). The defendants cite *Tracinda Corp. v. Daimler-Chrysler AG*, 197 F.Supp.2d 42, 74 (D.Del. 2002), which asserts that Delaware imposes a heightened pleading standard on all civil conspiracy claims. But Rule 9(b), by its terms, applies only to claims involving "fraud or mistake," and no Delaware decision has held a civil conspiracy claim solely involving breach of fiduciary duty to the Rule 9(b) standard. *See Greenfield v. Tele-Communications, Inc.*, 1989 WL 48738, at *3 (Del.Ch.1989) ("[C]onspiracies are secret agreements and the law cannot expect a plaintiff, in order to state a non-dismissible claim, to plead eviden-

tiary matter which, if true, would establish the conspiracy.") (Allen, C.); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 n. 29 (Del.Ch.2005) (stating in a breach of fiduciary duty case involving civil conspiracy claims: "Because [the plaintiff] does not separately allege fraud as a count upon which it claims relief, I question the extent to which Rule 9(b) should apply to this circumstance"). The frequent assertion that civil conspiracy claims require particularized allegations of fact may simply stem from the fact that civil conspiracy claims often do involve fraud. *See Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1521 (N.D.Cal.1990) ("This insistence upon a higher level of specificity may result from the frequent presence of fraud as part of plaintiff's claim, which brings the complaint under Fed.R.Civ.P. § 9(b) that the circumstances constituting fraud be stated with particularity.") (quotations omitted). Because this is not a fraud or a mistake case, Allied is not required by Rule 9(b) to plead its civil conspiracy claim with particularity. But even if Allied was subjected to the higher pleading standard, it has met that burden here.

show that that concern does not so easily apply to this case and why it is arguable that crafting context-specific exceptions to the general rule upholding the separate existence of the parent and subsidiary might be a better approach than invariably ignoring that separate existence with respect to all intra-enterprise conspiracy claims.

One traditional example, in which a parent is generally incapable of conspiring with its subsidiary, arises in the antitrust context and involves common pricing strategies by wholly-owned subsidiaries of a parent corporation. In *Copperweld Corp. v. Independence Tube Corp.*,[47] The United States Supreme Court refused to consider such a strategy to be a conspiracy in restraint of trade under § 1 of the Sherman Act. There is an obvious reason for the Supreme Court's decision to treat such pricing strategies as those of one entity. Otherwise, large businesses could not take legitimate advantage of the liability-insulating effects and other benefits of using multiple subsidiaries.[48] By doing so, a large business would subject itself to price-fixing claims simply by engaging in enterprise-wide pricing strategies. Section 1 of the Sherman Act was not intended to ad-

dress such activity. Notably, however, by allowing such pricing activity to escape the reach of § 1, the Supreme Court was not insulating the behavior of large enterprises from the reach of the antitrust laws. Rather, by so ruling, the Supreme Court was implicitly holding that § 2 of the Sherman Act, which constrains unilateral monopoly behavior, was the appropriate framework to determine whether a large enterprise, acting through a variety of wholly-owned subsidiaries, was illegally injuring the interests of consumers. Put simply, the import of *Copperweld* for the question of whether the commonly-controlled Glencoe entities can be held responsible for conspiring to transfer value from Sun I to Investors in order to enrich the Glencoe corporate family at Allied's expense is insubstantial.[49]

Likewise, this case does not involve the classic efficient breach scenario that underlies the limited privilege in the tortious interference context.[50] In that scenario, a solvent subsidiary, after consultation with the parent, knowingly breaches a contract on the premise that the subsidiary will be better off, even after paying the injured party damages for breach. Society's inter-

---

**47.** 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

**48.** *Id.* at 772–73, 104 S.Ct. 2731 ("[A] corporation may adopt the subsidiary form of organization for valid management and related purposes. Separate incorporation may improve management, avoid special tax problems arising from multistate operations, or serve other legitimate interests [such as facilitating compliance with regulatory or reporting laws].").

**49.** *See Shared Comm. Serv. Of 1800–80 JFK Blvd., Inc. v. Bell Atlantic Properties, Inc.*, 692 A.2d 570, 573–74 (Pa.Super.Ct.1997) ("Unique treatment of ... separate entities may be justified in the antitrust context because, as the Supreme Court stated, 'there is nothing inherently anticompetitive about a corporation's decision to create a subsidiary.'

We find no compelling reason, however, to justify a similar *per se* rule ignoring legal corporate form in the common law conspiracy context.") (internal citations omitted).

**50.** *See Shearin*, 652 A.2d at 591 ("If one is privileged by reason of a recognized relationship to discuss the financial welfare of an affiliated party, one may in good faith suggest that a termination of a contract, and the assumption of any resulting liability, would be beneficial to that party. Thus, in my opinion, where corporations affiliated through joint ownership confer with respect to a contract to which one of them is a party and a breach of that contract follows, there can be no non-contractual liability to the affiliated corporation.").

est in protecting such an option is markedly different than in protecting the freedom of a parent corporation to structure a transaction with a subsidiary that will impoverish the subsidiary at the expense of the subsidiary's other constituencies, while enabling the parent to reap profit through another newly created affiliate.[51]

Rather, this case more generally lacks the factual foundation often assumed in circumstances when commonly-owned entities are subjected to claims for concerted action. That factual foundation is that the parent and subsidiary share common economic interests.[52] Here, that common economic interest is markedly absent. Although Glencoe held all of Sun I's equity, it concedes that Sun I was either insolvent or nearly so. Allied, the holder of the $10 Million Note, arguably had a much greater interest in Sun I's solvency than Glencoe. It was precisely because of this reality that Glencoe had a plausible motive to injure Sun I by diverting value from Sun I to BH II and then to Investors. The potential

for a controller to use its control of a subsidiary, not to enrich the subsidiary, but to divert value from the subsidiary to itself in a bad faith manner, is what motivated Shearin's bad faith test and our state's long-standing recognition of aiding and abetting liability. As a result, it is difficult to see why our law should flatly proscribe Allied's conspiracy claim in these circumstances, except on the grounds that it is redundant of Allied's aiding and abetting claim.

■■■ As a penultimate consideration, I acknowledge that some non-Delaware decisions have held that the recognition of a civil conspiracy claim would undermine the supposedly better settled and clearer tests used for veil piercing and alter ego liability.[53] Would it were that veil piercing doctrine was in such an enviable state! But, frankly, legal doctrine in that area is rightfully criticized for its ambiguity and randomness.[54] As distinguished scholars

---

51. *Id.* (permitting a tortious interference claim when the interfering party "was not pursuing in good faith the legitimate profit-seeking activities of the affiliated enterprises").

52. *E.g., Wallace v. Wood,* 752 A.2d 1175, 1183 (Del.Ch.1999) ("[W]holly owned affiliates ... share the commonality of economic interests which underl[ies] the creation of [a tortious] interference privilege.") (quoting *Shearin,* 652 A.2d at 590–91 n. 14) (bracketed material added).

53. *See, e.g., Pizza Management, Inc. v. Pizza Hut, Inc.,* 737 F.Supp. 1154, 1166 (D.Kan. 1990) (noting that "where the alleged harm and motives are mostly economic in nature and the overt acts primarily attributable to the wholly-owned subsidiary, a civil conspiracy claim in almost all circumstances would [otherwise] also exist against the parent corporation," and that if a court were to allow such a result, "the stricter burdens governing the alter ego doctrine and the policy value reflected in those burdens would be readily circumvented").

54. As early as 1926, Benjamin Cardozo referred to this area of the law as being "enveloped in the mists of metaphor." *Berkey v. Third Ave. Ry. Co.,* 244 N.Y. 84, 94, 155 N.E. 58 (1926). Commentators have been even more critical in recent years. *See generally* Stephen M. Bainbridge, *Abolishing Veil Piercing,* 26 J. CORP. L. 479, 507 (2001). "Legal writers have described judicial decisions to pierce the veil as 'irreconcilable and not entirely comprehensible,' 'defying any attempt at rational explanation,' and occurring 'freakishly.'" Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study,* 76 CORNELL L.REV. 1036, 1036–37 (quoting PHILLIP I. BLUMBERG, THE LAW OF CORPORATE GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS 8 (1983), Jonathan M. Landers, *A Unified Approach to Parent, Subsidiary & Affiliate Questions in Bankruptcy,* 42 U. CHI. L.REV. 589, 620 (1975), and Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability & the Corporation,* 52 U. CHI. L.REV. 89, 89 (1985), respectively).

have noted, the tests used to determine whether a corporate veil should be pierced, or an entity should be considered a "mere alter ego," yield few predictable results.[55] Further, veil-piercing doctrine, which originally developed in the context of finding individual (human) shareholders liable for corporate debts, is not well equipped to sort out the different question of parent and subsidiary liability in modern, sophisticated corporate groups.[56] Many of the factors frequently employed in veil piercing analysis are irrelevant to the question of whether, in all fairness, a parent corporation should be forced to an-

swer for the acts of its subsidiary.[57] It is thus arguable that the use of rigorous tests of conspiracy, aiding and abetting, and tortious interference would produce more certainty and strike the correct balance.[58] Those tests only hold affiliates liable for concerted activity that the affiliates know to be unlawful. Under Delaware law, those tests do not permit the court to hold the affiliates liable for mere negligence; rather, scienter is required, causing the liability of a parent to turn on the more appropriate notion of the parent's own culpability for the harm caused to a plaintiff.[59]

55. *See generally* Thompson, 76 CORNELL L.REV. 1036 (finding, after an exhaustive empirical survey, that the same general facts often appear in cases providing relief and cases denying relief, and that fundamental assumptions that most lawyers make with respect to veil piercing—i.e. that it is easier to pierce in tort cases than contract cases, and that it is easier to pierce the veil of a wholly-owned subsidiary—were not reflected in the study's results).

56. *See* Phillip I. Blumberg, *The Corporate Entity in an Era of Multinational Corporations,* 15 DEL. J. CORP. L. 283, 328 (1990) ("[T]he much criticized, irreconcilable, and unpredictable nature of [veil piercing] decisions should leave no doubt as to the fundamental inadequacy of traditional entity law to deal with the problems presented by the new corporate world.").

57. *See* Bainbridge, 26 J. CORP. L. at 513, 524 (noting that a well counseled shareholder can often prevent veil piercing by following various corporate formalities, and that when courts focus on those traditional factors, they obscure the real issue of whether the shareholder-parent is itself culpable with respect to the harm caused to the plaintiff who is seeking to pierce the veil); David Millon, *Piercing the Corporate Veil, Financial Responsibility, and the Limits of Limited Liability* 3 and 25 (Washington & Lee Public Legal Studies Research Paper Series, Working Paper no. 2006–08), *available at* http://ssrn.com/abstract=932959 [hereinafter *Millon Paper*] (stating that the law should not permit shareholders to use limited liability to opportunisti-

cally extract value from creditors, and that without regard to corporate formalities, undercapitalization, and other traditional veil piercing factors, "[t]he question ought to be whether the controlling shareholders have somehow used their powers of control illegitimately"); RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 407 (4th ed. 1992) (criticizing the veil piercing doctrine's focus on corporate formalities, undercapitalization, and the agency character of the corporation).

58. *See Bainbridge,* 26 J. CORP. L. at 535 ("[J]udicial analysis [should focus on whether] the defendant-shareholder [did] anything for which he or she should be held directly liable. Did the shareholder commit fraud, which led a creditor to forgo contractual protections? Did the shareholder use fraudulent transfers or insider preferences to siphon funds out of the corporation?").

59. Professor Bainbridge has argued that it is more defensible to hold all the constituent elements of an "enterprise" operated through subsidiaries liable for harm committed by one of its constituent parts through "enterprise liability" than to hold the ultimate set of stockholders of the parent liable through veil piercing. As I understand the tests for enterprise liability used in some states, they are not markedly more certain than the traditional veil piercing or alter ego inquiries. *See Pan Pacific Sash & Door Co. v. Greendale Park, Inc.,* 166 Cal.App.2d 652, 333 P.2d 802, 806 (1958) (setting forth a basic standard for invoking enterprise liability that requires a two pronged showing similar to veil piercing tests:

■ Finally, I refuse to rest a ruling on anthropomorphic grounds and to analogize business entities to humans. That is, I disagree with *Copperweld* and its progeny to the extent that those cases conclude that a parent and its subsidiary cannot conspire with one another because they don't possess "two separate corporate consciousnesses" (i.e. that they have only a single mind) and are thus incapable of "agreement."[60] The fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme. It is precisely because the corporations have, as a presumptive matter, a separate legal existence irrespective of their common control, that doctrines like conspiracy and aiding and abetting may have a policy purpose. Moreover, as already noted, the idea that the economic interests of a parent and subsidiary are always aligned when the parent owns all the equity of the subsidiary is, if accepted as an unvarying natural law, wrong. As important, even in criminal conspiracies involving more than one human, it is not uncommon for one of the participants to have a dominating relationship towards the others. That does not render the others less legally culpable for their own decisions to participate in the common plan. The fact that affiliated entities are directed by common persons does not self-evidently render those entities—as societally chartered persons with separate legal status—obviously immune for their own actions in aid of an illegal plan that causes harm. There are principled reasons for cabining the situations when conspiracy claims can lie against commonly-owned entities. That they are conceived of as having one hypothetical "brain" is not one of them.[61] And under the confused jurisprudence of "alter ego" liability, a defense argument of that kind amounts to an argument in favor of disrespecting their separate corporate forms and holding the parent liable.[62]

■ In sum, Allied's complaint pleads facts that satisfy the elements of a cause of action for civil conspiracy as articulated by our Supreme Court. The defendants' argument—that entities with common equity ownership can never conspire illegally with

---

(1) such a high degree of unity of interest between two entities that their separate existence had de facto ceased; and (2) treating the two entities as separate would promote injustice). Professor Bainbridge indeed admits that using "enterprise liability" as the operative doctrine would not solve the problem of the unpredictability of veil piercing analysis in the parent-subsidiary context. What *is* more certain and predictable is that scienter-based doctrines like civil conspiracy require a showing that a parent or affiliate was itself a knowing participant in unlawful conduct. As a result, such doctrines comport with Bainbridge's more general recommendation of focusing the liability inquiry on each defendant's own conduct and culpability for the underlying wrong.

60. *See Copperweld*, 467 U.S. at 771, 104 S.Ct. 2731.

61. As one commentator has recently put it, the search for a corporation's own "will" is absurd. *Millon Paper* at 23. "No corporation in the world has a mind of its own; they are fictitious entities. People control corporations." Franklin A. Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil*, 76 Or. L.Rev. 853, 864 (1997).

62. *See, e.g., Albert v. Alex. Brown Management Services, Inc.*, 2005 WL 2130607, at *9 (Del. Ch.2005) ("The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent."). Allied's complaint in fact pleads a count based on alter ego liability, and the defendants have denied Allied's alter ego allegations. This, of course, is in tension with their contention that they should be treated as a single legal actor for conspiracy purposes.

one another—is not one that convinces me.[63] Therefore, their motion to dismiss Count VIII is denied except with respect to the civil conspiracy claims asserted against the John Doe defendants.

## VII.  *Conclusion*

For the reasons stated above, the defendants' motion to dismiss is granted as to Allied's breach of contract, implied covenant, and tortious interference claims (Counts II–IV of Allied's complaint), and as to Allied's civil conspiracy claim (Count VIII) to the extent it is asserted against the John Doe defendants.  The remainder of the motion is denied.

IT IS SO ORDERED.

**63.** I need not address the question of whether corporate managers can be held civilly liable for conspiring among themselves and with their own corporation.  That is a separate question from the one presented in this case.  *See* Kathleen F. Brickey, *Conspiracy, Group Danger and the Corporate Defendant,* 52 U. Cin. L.Rev. 431, 432–33 (1983).  Most courts suggest a negative answer to this separate question unless the corporate agents were acting for their own personal financial gain rather than for the benefit of the corporation.  *Amaysing Tech.,* 2005 WL 578972, at *7; *Elliott v. Tilton,* 89 F.3d 260, 265 (5th Cir.1996); *see also Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 110 (7th Cir.1990) (noting that when the managers of a corporation act within the scope of their employment, the corporation and its managers are "considered as one person in law") (quoting William Blackstone, 1 *Commentaries on the Laws of England* 456 (1st ed. 1765)); *but cf. Wallace,* 752 A.2d at 1184 (refusing to dismiss a claim that the officers and directors of a corporate general partner entity aided and abetted the corporate general partner's breach of fiduciary duty); *and* Restatement (Third) of Agency § 7.01 ("An agent is subject to liability to a third party harmed by the agent's tortious conduct.  Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment.").  That rule is not inconsistent with the general rule that multiple agents of a single corporation can constitute a plurality of actors for criminal conspiracy purposes.  Criminal law, unlike civil conspiracy theory, is not concerned with who will be liable (in the sense of who must pay money to compensate) for a harm.  Instead, criminal law punishes a mere agreement to commit an illegal act, regardless of whether it is carried out or a harm is caused, because the mere involvement of two or more persons in a criminal plan is thought to present such risks to society that punishment is warranted.  *See* Sarah N. Welling, *Intracorporate Plurality in Criminal Conspiracy Law,* 33 Hastings L.J. 1155, 1179 (1982).  This "group danger" punishment rationale has been universally rejected with respect to civil conspiracies.  Leach, 54 U. Miami L.Rev. at 15–16.  When corporations commit intentional torts or breaches of contract, they obviously do so at the behest of some human agent and often more than one.  Therefore, if corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could also regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally.  In this respect, the problem presented is somewhat the opposite of whether commonly-owned entities can conspire.  In the case of holding managers civilly liable for conspiring with each other to cause illegal action by the corporation, the law would deny the presumptively independent existence of the corporation by invariably holding its managers liable for the corporation's acts by "conspiring with themselves and it."  In the question of whether commonly-owned entities can conspire, the law would deny the separate status by *refusing* to allow the conspiracy claim.