**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| OPTIMISCORP, a Delaware corporation, ALAN MORELLI, and ANALOG VENTURES, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 8773-VCP |
| v. | ) ) | |
| JOHN WAITE, WILLIAM ATKINS, GREGORY SMITH, and WILLIAM HORNE, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**

Submitted: October 22, 2014
Decided: January 28, 2015

Anthony W. Clark, Esq., Douglas D. Herrmann, Esq., Amy C. Huffman, Esq., SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Plaintiffs OptimisCorp, Alan Morelli, and Analog Ventures, LLC.*

Stephen P. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., BAYARD, P.A., Wilmington, Delaware; *Attorneys for Defendants John Waite, William Atkins, and Gregory Smith.*

Bruce E. Jameson, Esq., Eric J. Juray, Esq., PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Attorneys for William Horne.*

**PARSONS, Vice Chancellor.**

Before the Court are the plaintiffs' motion to amend the complaint and the defendants' related motion *in limine* to exclude allegedly undisclosed causes of action. In short, the defendants moved for summary judgment, and the plaintiffs responded with evidence that the defendants do not believe fairly was pled or disclosed during discovery. Following argument on the motions for summary judgment, the plaintiffs moved to amend their complaint and the defendants sought to exclude the purportedly new allegations and claims. For the reasons that follow, the plaintiffs' motion to amend is denied and the defendants' motion *in limine* is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff OptimisCorp ("Optimis" or the "Company") is a healthcare technology and service provider. Plaintiff Alan Morelli founded Optimis in 2006 and has been the CEO and chairman of the board ever since. Morelli also is the managing member of Plaintiff Analog Ventures, LLC ("Analog," and together with Optimis and Morelli, "Plaintiffs"), a company that owns a significant percentage of Optimis's stock. Overall, Morelli directly or indirectly controls almost 7.4 million Optimis shares.[1]

Defendants John Waite, William Atkins, and Gregory Smith (the "Director Defendants") served on the Optimis board from June 2007 until their resignations on June 25, 2013. Waite also served as the Company's Chief Operating Officer from 2009 until June 25, 2013. The Director Defendants became associated with Optimis after they

---

[1]    There is no apparent indication in the record as to what percentage ownership these 7.4 million shares represent.

1

had sold their company, Rancho Physical Therapy, Inc. ("Rancho"), to Optimis. As a result of that sale, the Director Defendants acquired nearly eight million shares of Optimis stock.

Defendant William Horne (together with the Director Defendants, "Defendants") started as a consultant to Optimis in 2006. From January 2008 until May 2013, he served as the company's Chief Financial Officer. Horne owns slightly less than 170,000 shares of Optimis stock.

On August 5, 2013, Plaintiffs filed their Verified Complaint (the "Complaint") alleging that Defendants: (1) breached their fiduciary duties; (2) violated a stockholder agreement to which they were, and are, parties; (3) tortiously interfered with the Company's contracts and business relations; and (4) generally attempted an unlawful takeover of Optimis by, among other things, using the pretext of purportedly false sexual harassment allegations made by Tina Geller, an Optimis physical therapist. Roughly a year later, after substantial discovery, the Director Defendants and Horne separately moved for summary judgment. The briefing on those motions exceeded 280 pages. I heard argument on the motions for summary judgment on September 8, 2014, and by Order entered on the same day as this Memorandum Opinion, I deny both motions.

The crux of the current dispute relates to arguments made during the briefing on summary judgment. In connection with their opposition briefs, on August 24, 2014, Plaintiffs filed three affidavits, one each from Stephen Levine, Helene Fearon, and Catherine Gentry. The Fearon and Levine affidavits, which are almost identical, aver facts that Plaintiffs rely on to support their allegations that Defendants were involved in a

2

conspiracy along with Joe Godges, George Rohlinger, Jeanine Gunn, Fearon, Levine, and others to undermine Morelli. Those affidavits also allegedly support Plaintiffs' tortious interference claims by detailing the circumstances of what the parties have called the "Fearon Rescission."[2] Of particular note, Plaintiffs entered into Confidential Cooperation and Release Agreements with Fearon and Levine on May 2 and May 11, 2014, respectively, but the affidavits first appeared as exhibits to Plaintiffs' opposition briefs in late August. The Gentry affidavit purports to support Plaintiffs' allegations of continued interference with Rancho.

Intimately intertwined with resolution of the summary judgment motions are Plaintiffs' motion to amend the complaint (the "Motion to Amend") and Defendants' joint motion *in limine* to exclude undisclosed causes of action ("Defendants' Motion *in Limine*"). Plaintiffs moved to amend on September 10, 2014, primarily to allege the existence of additional co-conspirators, and Defendants filed their Motion *in Limine* on September 26. The Motion *in Limine* represents, in effect, a further opposition to the Motion to Amend and both parties relied, in part, on arguments made in their respective summary judgment briefs regarding the motions to amend and *in limine*. After full briefing on the latter two motions, the Court heard oral argument on October 22.

---

[2] Tim Fearon, Helene's husband, owned FearonPT, a physical therapy company. He sold that company to Optimis in September 2010 in a stock purchase agreement ("SPA"). Under the terms of the SPA, Tim Fearon could rescind the transaction anytime before midnight on December 21, 2012. He ultimately did so, allegedly at the urging and encouragement of Defendants. Plaintiffs allege that Defendants' actions regarding the Fearon Rescission constituted tortious interference.

Because of the close relationship between the summary judgment motions and the related motions to amend and to exclude undisclosed causes of action, I considered it most efficient to resolve the latter motions first. This Memorandum Opinion, therefore, constitutes my ruling on Plaintiffs' Motion to Amend and Defendants' Motion *in Limine*.[3] In considering the motions at issue, the Court extensively reviewed the items in the discovery record to which the parties cited in their briefs. All told, this required review of over a thousand pages of material in addition to the already substantial briefing on the several pending motions in this case.

## II.    STANDARDS OF REVIEW

Because Plaintiffs filed their Motion to Amend after the scheduled date for completion of fact discovery and after briefing and argument on comprehensive motions for summary judgment, the pending motions require me to consider the intersection of the principles of notice pleading and the rules governing discovery. Considerations of that nature were important in deciding whether to allow the requested amendment of the Complaint.

---

[3]    In a separate Order being entered this same date, I deny Defendants' motions for summary judgment. I also note that Defendants argued that the Motion to Amend should be denied as futile because none of the claims would survive a Rule 12(b)(6) motion to dismiss. Defendants raised similar arguments in their summary judgment briefing. I do not consider those arguments persuasive, and that contributed to my decision to deny the motions for summary judgment. This Memorandum Opinion focuses almost entirely on Plaintiffs' timeliness, the prejudice to Defendants, and Plaintiffs' actions during discovery.

4

### A. Notice Pleading

A complaint must contain sufficient facts to place the opposing party on notice of the claims asserted and the basis for relief.[4] This pleading standard is "minimal."[5] The Court must "accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[6]

### B. Amendment of Pleadings

Court of Chancery Rule 15 governs motions for leave to amend. After a responsive pleading has been filed, as it was long ago in this case, a party may amend its pleading "only by leave of Court or by written consent of the adverse party; and leave shall be freely given when justice so requires."[7] Courts have interpreted this provision to allow for liberal amendment in the interest of resolving cases on the merits.[8] "A motion to amend may be denied, however, if the amendment would be futile, in the sense that the

---

[4] Ct. Ch. R. 8(a) ("A pleading . . . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the party deems itself entitled.").

[5] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[6] *Id.*

[7] Ct. Ch. R. 15(a).

[8] *See, e.g.*, *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *7 (Del. Ch. May 21), *aff'd*, 962 A.2d 916 (Del. 2008); *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *3 (Del. Ch. Oct. 19, 2006).

legal insufficiency of the amendment is obvious on its face."[9] That is, the motion may be denied if the proposed amendment immediately would fall to a Rule 12(b)(6) motion to dismiss.[10] Leave to amend also may be denied if there is a showing of substantial prejudice, bad faith, dilatory motive, or repeated failures to cure by prior amendment.[11] Ultimately, a motion for leave to amend is left to the sound discretion of the trial court.[12]

In the specific circumstances of this case, I also consider Court of Chancery Rule 15(aaa) relevant by analogy. Plaintiffs filed their motion to amend after conclusion of the briefing and argument on Defendants' motions for summary judgment. While this procedural posture technically falls outside the scope of Rule 15(aaa),[13] I consider the theory underlying the rule instructive. "The purpose of the rule is to minimize situations

---

[9] *NACCO Indus., Inc. v. Applica Inc.*, 2008 WL 2082145, at *1 (Del. Ch. May 7, 2008).

[10] *See St. James Recreation, LLC v. Rieger Opportunity P'rs, LLC*, 2003 WL 22659875, at *5 (Del. Ch. Nov. 5, 2003).

[11] *See, e.g.*, *Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *7; *NACCO Indus., Inc*, 2008 WL 2082145, at *1; *Crowley*, 2006 WL 3095952, at *3.

[12] *See, e.g.*, *Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *7 (citing *Bokat v. Getty Oil Co.,* 262 A.2d 246, 251 (Del. 1970)); *NACCO Indus., Inc.*, 2008 WL 2082145, at *1.

[13] *Cf. Stern v. LF Capital P'rs, LLC*, 820 A.2d 1143, 1147 (Del. 2003) (construing Rule 15(aaa) to preclude a plaintiff, after responding to a motion to dismiss, from dismissing the case pursuant to Rule 41(a) and re-filing the case, despite the fact that Rule 15(aaa) did not mention Rule 41(a) at the time, nor did Rule 41(a) then reference Rule 15(aaa)). Rule 15(aaa) later was amended in conformance with the reasoning of the *Stern* decision.

where this Court must adjudicate multiple motions to dismiss in the same action."[14] Here, granting the motion to amend would expand the scope of the issues the parties and the Court would have to face at trial, not to mention the difficulties it may have created for Defendants in the final stages of discovery. The trial in this action will begin on February 6, 2015. Accordingly, I am reluctant to afford Plaintiffs, who delayed moving to amend until after the conclusion of briefing and argument on motions for summary judgment, the full benefit of the liberal standards generally governing amendment of pleadings, especially when the amendments they seek relate directly to the issues addressed in the summary judgment motions and pose problems in terms of fair notice.

### C.    Discovery

The "purpose of discovery is to advance issue formation, to assist in fact revelation, and to reduce the element of surprise at trial."[15] Interrogatories are one method of discovery, and parties served with interrogatories must answer them fully and truthfully.[16] Additionally, Court of Chancery Rule 26(e) requires supplementation of discovery responses in certain instances. As relevant here, Rule 26(e) provides that:

> (1)    A party is under a duty seasonably to supplement the response with respect to any question directly addressed to

---

[14]    *Crowley*, 2006 WL 3095952, at *3.

[15]    *Levy v. Stern*, 687 A.2d 573 (Table), 1996 WL 118160, at *2 (Del. 1996) (citing *Buchanan Serv., Inc. v. Crew*, 122 A.2d 914 (Del. Super. 1956)).

[16]    Ct. Ch. R. 33(b)(1) ("Each interrogatory . . . shall be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable.").

7

(A) the identity and location of persons having knowledge of discoverable matters . . . .

(2) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which (A) the party knows that the response was incorrect when made, or (B) the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

With these concepts in mind, I turn to the merits of Plaintiffs' Motion to Amend and Defendants' Motion *in Limine*.

## III. ANALYSIS

At the outset, I note some of the procedural backdrop in this case. Plaintiffs filed their Complaint on August 5, 2013. Along with the Complaint, Plaintiffs moved for a preliminary injunction and for expedited treatment. Although I denied the motion to expedite, I made clear to the parties that I intended this action to proceed relatively promptly,[17] and, to that end, that I expected "strict adherence to the requirements of the Court of Chancery rules."[18] The initial scheduling order established October 15, 2013 as the deadline for Plaintiffs to amend their Complaint, with trial scheduled for June 17-20, 2014. A second scheduling order, granted on March 19, 2014, moved the trial date to August 25-28, 2014. A third scheduling order granted on June 5, 2014, again postponed the trial date, this time to October 20-23, 2014. On October 9, being confronted with a

---

[17] Mot. to Expedite Arg. Tr. 72 (Aug. 16, 2013).

[18] *Id.* at 71. During argument on the motion to expedite, I also observed as to Plaintiffs' Complaint that the "claims, to my mind, are fairly nebulous." *Id.* at 67.

flurry of pre-trial motions, including the two motions currently before me, I rescheduled the trial yet again, to February 6-13, 2015. Thus, after Plaintiffs originally moved to expedite this matter, after repeatedly rescheduling the trial date, and nearly eleven months after the relevant deadline for amending the Complaint expired, this Court was faced in September and October 2014 with a motion to amend the Complaint and a related motion to exclude undisclosed causes of action.[19]

Plaintiffs' proposed Amended Complaint, in addition to making several changes in the substantive allegations, sets forth new independent counts for civil conspiracy and aiding and abetting, and adds to each of the breach of contract counts an allegation of breach of the implied covenant of good faith and fair dealing. In moving to amend, Plaintiffs also maintained, essentially in the alternative, that an amendment is unnecessary here because the claims set forth in the proposed Amended Complaint adequately were pled in the initial Complaint.[20] Defendants argue that the proposed amendments are futile because they cannot survive a motion to dismiss and also that the Court should deny the amendments in the exercise of its discretion for reasons such as untimeliness. Defendants' Motion *in Limine* to exclude undisclosed causes of action redoubles their efforts to defeat the Motion to Amend and also seeks to exclude certain

---

[19]    I heard argument on these two motions, among others, on October 22, 2014.

[20]    Pls.' Mot. to Am. 4 ("Plaintiffs' proposed amendments simply clarify the claims which plaintiffs have pursued and continue to pursue in connection with this litigation.").

9

evidence, including documents that Defendants assert were produced too late to be considered at trial.[21]

## A.    The Discovery Record

The Complaint alleges three categories of wrongs by Defendants: (1) undermining Morelli's authority and frustrating the Company's strategic plans; (2) seizing control of Rancho; and (3) blocking the Company's efforts to obtain financing.[22]  The Complaint explicitly uses the term "conspiracy" only once.[23]  The overall tenor of the Complaint, however, evinces an overarching theory of a conspiracy by Defendants to oust Morelli and take control of Optimis.[24]  Paragraph 16, which mentions a conspiracy, illustrates this point:

> Thus, starting in 2010, just two years into the partnership with Morelli to which they freely agreed—and after opting not to exercise their rescission rights to unwind the transaction—and despite their contractual promise that Morelli would have complete control for seven years, the Rancho Defendants decided that, rather than forthrightly raise their concerns with the Board, they would secretly prepare to mount a hostile takeover of the Company.  The Rancho Defendants began a campaign to undermine Morelli and his software development strategy, recruited Joseph Godges—a director and employee

---

[21]    Aside from the specific holdings in this Memorandum Opinion, I reject Defendants' arguments about untimely document production.  The most recent rescheduling of the trial has provided Defendants sufficient time to review the disputed categories of documents.

[22]    Compl. ¶ 3.

[23]    *Id.* ¶ 16.

[24]    The Complaint repeatedly uses phrases such as "secret plan," "secret plot," and "coup attempt."  *Id.* ¶¶ 16, 17, 23-25, 27, 30, 32.

of the Company who Morelli had learned was moonlighting in violation of his employment agreement with the Company and was holding Godges accountable to the Company for his breaches—to their cause, and entered into a secret plot to seize control of OptimisCorp, in breach of their contract with Morelli (and the other stockholders) and in breach of their fiduciary duties to the Company and all of its stockholders. In February 2012, the Rancho Defendants also enlisted defendant Horne—who had been involved in a clandestine romantic affair with Morelli's ex-wife for several years—to join their unlawful conspiracy.[25]

Thus, a good argument can be made that Defendants were on notice from the early stages of this litigation that Plaintiffs were alleging a conspiracy of some sort.[26] Counsel for Plaintiffs directly stated as much in June 2014 at the argument on Horne's motion to compel.[27] Furthermore, to the extent that the Complaint alleged a conspiracy, it also alleged aiding and abetting. If the two concepts are not conterminous in the corporate context,[28] then aiding and abetting is the narrower of the two and fairly is encompassed within the overarching conspiratorial allegations in the Complaint.

---

[25] *Id*. ¶ 16.

[26] As discussed below, Horne's interrogatories show that he understood the Complaint to be alleging some form of conspiracy. Because Defendants coordinated their discovery, I find that all Defendants were on notice.

[27] Defs.' Mot. to Compel Arg. Tr. 49 (Plaintiffs' counsel: "You don't have to be an actor in every element of the conspiracy to be liable for all of the harm of the conspiracy. And that's exactly the situation which we're alleging here.").

[28] *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1089 n.82 (Del. 2001) (noting overlap between the two theories and collecting cases); *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038-39 (Del. Ch. 2006).

11

The controversy over whether to allow Plaintiffs' proposed amendments to the Complaint relates closely to how the parties conducted discovery in this case. The real source of contention appears to involve the following questions: (1) Who were the members of the conspiracy? (2) What were the predicate bad acts of the conspiracy? and (3) When did the conspiracy terminate, if ever? The relevant standard in Delaware is notice pleading. Plaintiffs need not plead every fact supporting their case, nor must they plead a legal theory *per se*. In the context of conspiracy, however, answers to the foregoing questions become vitally important. "The benefit to a plaintiff of establishing a civil conspiracy claim is that all conspirators will be vicariously liable for the acts of co-conspirators in furtherance of the conspiracy."[29] Consequently, both the number and identity of the actors and the duration of the conspiracy dramatically will affect the scope of this case and the potential liability of Defendants. I therefore address next each of the three questions identified above.

### 1. Who are the members of the alleged conspiracy?

The proposed Amended Complaint does not seek to add any additional defendants. It does identify, however, several potential co-conspirators who were not fairly disclosed in the original Complaint or discovery. Beyond the four named Defendants, the original Complaint identified only Joe Godges as another co-conspirator. Thus, Defendants received adequate notice that Godges was an alleged co-conspirator. The only other individuals identified in the original Complaint are Tina Geller and Terry Doherty. The

---

[29] *Allied Capital Corp.*, 910 A.2d at 1036.

12

language of the Complaint is broad enough to suggest that Geller may have been a member of the conspiracy,[30] but Plaintiffs have not pressed that position. Beyond these specifics, the Complaint includes only vague additional language suggesting that others were, or may have been, involved in some unspecified manner.[31]

Discovery enables the parties to uncover the factual bases for the allegations in a complaint. Contention interrogatories usefully advance this purpose. In this case, both sets of Defendants served such interrogatories on Plaintiffs.[32] Plaintiffs responded to the Director Defendants' Interrogatories and Horne's Interrogatories on January 14, 2014, and February 1, 2014, respectively.

Horne specifically asked that Plaintiffs: "Identify every fact you contend supports your allegations in paragraph 16 of the Verified Complaint," with specific reference to the conspiracy. Plaintiffs responded by identifying George Rohlinger as an additional co-conspirator. Without specifically naming anyone else not mentioned in the Complaint,

---

[30]   *E.g.*, Compl. ¶ 20 ("[T]he Rancho Defendants, Horne and others acting at their direction . . . bribed Geller into cooperating in an investigation against Morelli by offering her a raise and other perquisites.").

[31]   *E.g.*, *id.* ¶ 17 ("[D]efendants solicited and indoctrinated key employees—including several officers who directly reported to Morelli—and consultants of the Company to oppose Morelli and his initiatives by telling them that the Rancho Defendants were working on a plan to oust him from the Company."); *id.* ¶ 20 (" . . . the Rancho Defendants, Horne and others . . . "); *id.* ¶ 22 ("Waite and others contacted certain of the other directors and stockholders . . . and offered them lucrative employment contracts, stock options and other valuable inducements . . . .").

[32]   Plaintiffs' responses to the Director Defendants' Interrogatories and Horne's Interrogatories will be cited as "DD.I. Resp. [#]" and "H.I. Resp. [#]," respectively.

13

Plaintiffs' response three times used the phrase: "Defendants, individually and working with other employees, consultants, stockholders, business partners, and third parties . . . ."[33] In defending against a claim for conspiracy, few facts are more important than the identity of the members of the conspiracy. Yet, Plaintiffs' response to Horne's Interrogatory 5 fails to mention anyone new except Rohlinger. Based on the position Plaintiffs took in opposing Defendants' motion for summary judgment—namely, their contention that the conspiracy involved at least three other individuals—it is difficult to see how Plaintiffs' answer "fully"[34] responded to the interrogatory, which asked for "every fact."

Through their proposed Amended Complaint, Plaintiffs seek to include Helene Fearon, Stephen Levine, George Rohlinger, and Jeanine Gunn as co-conspirators, in addition to the individuals listed in the original Complaint. Fearon, Levine, and Gunn are all new additions, not fairly indentified as co-conspirators during discovery. I conclude, therefore, that Plaintiffs should not be permitted to amend their Complaint to allege, or to assert at trial on the basis of the original Complaint, that these individuals are co-conspirators.

In that regard, I find unpersuasive Plaintiffs' argument that Fearon, Levine, and Gunn were fairly disclosed as co-conspirators because their names were mentioned elsewhere in the discovery record. For instance, Fearon and Gunn were identified, along

---

[33]     H.I. Resp. 5; *see also* DD.I. Resp. 1.

[34]     Ct. Ch. R. 33(b)(1).

14

with fifty-two other people or entities, as individuals with knowledge of the allegations in the Complaint.[35] But, someone having knowledge of those allegations is not necessarily a co-conspirator. Morelli, for example, is identified as a knowledgeable individual; yet, no one would contend that he was a member of the alleged conspiracy. Levine was not included in the list of persons with relevant knowledge, but he was listed as one of twenty-four or more employees who were "solicited and indoctrinated" by Defendants.[36] There is no basis in the existing record for inferring that everyone identified as an employee who was "solicited and indoctrinated" was a member of the conspiracy.

A plaintiff claiming a conspiracy must prove: "(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[37] It does not follow, as a matter of fact or logic, that an employee who was "solicited and indoctrinated" necessarily agreed, for example, to be part of a conspiracy to achieve an unlawful purpose. Plaintiffs knew how to name different sets of individuals in response to different interrogatories; they cannot pick and choose among those lists at this late stage in the proceeding to expand the scope of their claim for conspiracy by adding new

---

[35] DD.I. Resp. 14; H.I. Resp. 36.

[36] H.I. Resp. 6. Plaintiffs' answer to Horne's Interrogatory 6 also cross-references their response to Horne's Interrogatory 5.

[37] *Allied Capital Corp.*, 910 A.2d at 1036.

15

co-conspirators.[38] This is especially true where nothing in the discovery indicates that a new co-conspirator engaged in an allegedly wrongful act beyond the acts in which one or more of the co-conspirators named in the original Complaint allegedly engaged.

## 2. What bad acts allegedly were committed as part of the conspiracy?

Identifying the bad acts that were committed as part of the conspiracy remains difficult. The record is murky as to exactly what purported wrongs underlie several of Plaintiffs' theories. The Complaint identified the three categories of wrongs already mentioned. Plaintiffs' responses to Defendants' interrogatories further fleshed out some of the allegations in the Complaint. Both sets of Defendants asked specifically for an identification of the contracts or business relationships with which Defendants allegedly interfered. Plaintiffs listed, "among other things," eleven contracts or business relationships, and stated that "[o]ther instances of interference may be identified as discovery progresses."[39] In the circumstances of this case, Defendants contend that they did not receive fair notice in discovery of certain acts recently identified in Plaintiffs' opposition to summary judgment.

---

[38] *Compare* H.I. Resp. 6 (name every key employee Defendants solicited and indoctrinated: "employees include" twenty-four people), *with* H.I. Resp. 13 (name everyone comprising the "others" referenced in ¶ 20 of the Complaint as "acting at the[] direction [of the Director Defendants]" in connection with Geller's claim: listing seven people), *with* H.I. Resp. 18 (name everyone comprising the "others" referenced in ¶ 22 of the Complaint as having acted with Defendant Waite in connection with the alleged vote buying scheme: listing "at least" six people).

[39] DD.I. Resp. 2; H.I. Resp. 20.

16

In their effort to defeat summary judgment as to the tortious interference claims, Plaintiffs pointed to the following items or entities of relevance here[40]: (1) the Fearon Rescission; (2) Bank of the Internet ("BofI"); (3) Physical Therapy Provider Network ("PTPN"); (4) the Distance Swim Challenge; (5) solicitation of Rancho's referral contracts by the Director Defendants, as employees of All-Star Physical Therapy; and (6) improper use of Rancho's confidential information. I find that Plaintiffs adequately identified the alleged tortious interference with BofI, PTPN, and the Distance Swim Challenge in their discovery responses. Therefore, I need not discuss those matters further. Any issues relating to continued interference with Rancho are addressed in Section III.A.3 *infra*.

The Fearon Rescission[41] was not identified in the original Complaint or in the interrogatories as a contract or business relationship with which Defendants interfered. The Fearon Rescission was identified, however, by Morelli during the first day of his deposition on April 29, 2014, as one of three rescissions for which Defendants allegedly are responsible.[42] It is a close call whether the relevant excerpt from Morelli's deposition placed Defendants on notice that Plaintiffs would be pursuing tortious interference claims

---

[40]     This list excludes events relating to the alleged "coup," such as the Geller sexual harassment investigation, the contested renewal of the employment agreements by the Directors Defendants, and the Stockholders Agreement. Those matters have been in this case from the beginning.

[41]     *See supra* note 2.

[42]     The other rescissions were the Sovereign rescission and the Schreir PT rescission. Morelli Dep. 162-73, 249-50.

relating to the Fearon Rescission. Plaintiffs cited no other portion of the record as disclosing the Fearon Rescission.

The Company's other deponents appear not to have alluded to the Fearon Rescission at all. Indeed, the depositions of Laurent O'Shea undermine Plaintiffs' position. O'Shea was the Company's 30(b)(6) witness and a member of Optimis's board's independent committee. Defendants deposed him on two days: May 1 and July 30, 2014. On the second day, O'Shea was asked whether, other than the items identified in the Company's response to the Director Defendants' Interrogatory 2, he was "aware of any business or contractual relationship with which [the Director Defendants] have interfered."[43] O'Shea could not recall anything beyond what was listed in the interrogatories, with the exception of a company called WorkWell, and O'Shea knew almost nothing about what happened with WorkWell.[44] This answer by Optimis's 30(b)(6) witness is telling in at least two respects. First, the Company settled with Fearon and Levine on May 2 and May 11, 2014, respectively. Accordingly, the Company must have been aware of the Fearon Rescission by the second day of O'Shea's deposition. Second, on the first day of his deposition, O'Shea was asked whether he had come into possession of any information that would "alter or change the answers given in" response

---

[43]    O'Shea Dep. 346-47.

[44]    *Id.* at 349-50, 355-56.

to Horne's Interrogatories, and he stated that the Company had received a lot of information that "would add to" but not change the Company's answers.[45]

When asked about the various instances of tortious interference, O'Shea stated that most of the interference occurred before he joined the Optimis board and that the most knowledgeable person would be Morelli. The tortious interference claims are a significant part of this case. Despite admitting a general lack of knowledge about the instances of alleged tortious interference and despite identifying Morelli as the person who would know the most about the tortious interference claims, O'Shea did not discuss these items with Morelli before being deposed or, apparently, otherwise seek to inform himself as to those matters.[46] Having designated O'Shea as its 30(b)(6) witness, Optimis had a duty to prepare him appropriately.[47] To the extent O'Shea or Optimis failed to do so, Optimis is responsible for the consequences of his testimony and apparent lack of preparation.[48]

---

[45]     *Id.* at 75.

[46]     *Id.* at 349.

[47]     *See generally* DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 6.06[c] (2008) (describing process, procedure, and responsibilities involved in Rule 30(b)(6) depositions). *See also Fitzgerald v. Cantor*, 1999 WL 252748, at *3 (Del. Ch. Apr. 5, 1999) ("In the course of preparation . . . the organization must ensure that before testifying the witness [is] aware of the organization's full knowledge of the matters on which [he] will testify and any relevant information reasonably available to the organization.").

[48]     Ct. Ch. R. 30(b)(6). *See generally Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 166 & nn.47-48 (Del. Ch. 2006) (describing the expectations

Brian Wing also is an Optimis Director and was deposed on July 21, 2014. He serves on both the board's independent committee and its special committee.[49] Although not entirely clear from the depositions, the special committee apparently was responsible for dealing with the earlier action filed under 8 *Del. C.* § 225, which involved a number of the same parties to this action.[50] The independent committee, on the other hand, deals with subject matter relevant to this lawsuit. Wing also verified the Complaint in this action. As such, one would expect Wing to be a knowledgeable witness. Generally, however, he could not answer a number of relevant questions and appears to have received a substantial amount of his information solely from discussions with counsel, as to which Plaintiffs claimed privilege.[51]

Having considered all the circumstances, I have decided to exclude the Fearon Rescission from this case. Plaintiffs were aware of the Fearon Rescission when Morelli testified about it on April 29, 2014, at the absolute latest. Plaintiffs also settled with Fearon and Levine shortly thereafter. Notwithstanding these facts, O'Shea could not provide much, if any, relevant information about the tortious interference claims or

---

of a Rule 30(b)(6) witness and noting that a "designee under Rule 30(b)(6) is expected to inform himself as to the entity's knowledge, and to testify to the limits of the designation").

[49]    O'Shea Dep. 260-61; Wing Dep. 98.

[50]    *Morelli v. Waite*, Civ. A. No. 8001-VCP.

[51]    For example, Wing could not identify any facts about Paragraphs 16, 17, or 23 of the Complaint beyond his communications with counsel, as to which Optimis's counsel directed him not to answer on privilege or work product grounds. Wing Dep. 64-68, 80.

20

identify the Fearon Rescission as a relevant contract in his capacity as a Rule 30(b)(6) witness.[52] Any relevant knowledge Wing may have had apparently came from the lawyers and was not disclosed in his deposition. In addition, Plaintiffs did not list the Fearon Rescission as an item of tortious interference in their interrogatory responses or supplement those responses in that regard before they responded to Defendants' motion for summary judgment in late August 2014. Under these circumstances, I find that Defendants did not receive fair notice that Plaintiffs were pursuing a claim based on the Fearon Rescission. Plaintiffs' effective concealment of the settlements Optimis entered into with Fearon and Levine in May 2014, and the extent of Fearon's apparent firsthand knowledge of the Fearon Rescission reflected in her belated affidavit, further supports excluding that incident from this case.

### 3. What is the temporal scope of the alleged conspiracy?

Defendants, in their Motion *in Limine* and at argument, vigorously argued against allowing claims that post-date Defendants' employment with Optimis, which had ended

---

[52] *See Highland Select Equity Fund*, 906 A.2d at 166 n.47 ("'[P]roducing a person who knows nothing about the subject matter of the litigation is the functional equivalent of having spurned the deposition altogether. Consequently, Rule 30(b)(6) can be violated when a corporate party literally sends a human being to the deposition but the person is unequipped to participate meaningfully in the deposition.'") (quoting JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE 30.72 (3d ed. 2006)). O'Shea may have been able to participate meaningfully in other parts of his 30(b)(6) deposition, but that issue is not before me. The problem here stems primarily from his testimony regarding the tortious interference claims.

by June 25, 2013.[53]  I conclude, however, that the original Complaint adequately alleged ongoing interference with the Company and that Plaintiffs reiterated that position in their responses to Defendants' interrogatories.  Notwithstanding this conclusion, I grant Defendants' Motion *in Limine* as it relates to striking the affidavits of Fearon, Levine, and Catherine Gentry for purposes of Defendants' motion for summary judgment on the ground that they amounted to unfair surprise and were not consistent with the rules of discovery or this Court's scheduling orders.[54]  Plaintiffs produced all three of the affidavits challenged in the Motion *in Limine*—Fearon, Levine, and Gentry—well after the August 1, 2014 cutoff for fact discovery.[55]

The Complaint repeatedly references ongoing harm to Optimis.  For example, Paragraph 5 begins: "Therefore, in order to restrain defendants from continuing to harm

---

[53]    I note, for completeness, that Defendants appear to have accepted as fairly within this case a brief period in May and June 2013 after Horne was terminated during which the Director Defendants continued their employment.

[54]    Gentry is the Director of Marketing and Network Operations for Rancho, a company related to Optimis.  Thus, she appears to have been under the control of Optimis at all relevant times.  Nevertheless, Gentry was not identified in Plaintiffs' interrogatories as a person with knowledge of matters asserted in the Complaint. *See infra* notes 62-64 and accompanying text.

[55]    A scheduling order is an order of the Court that serves important purposes. *IQ Hldgs., Inc. v. Am. Commercial Lines Inc.*, 2012 WL 3877790, at *2 (Del. Ch. Aug. 30, 2012) ("Scheduling orders and discovery cutoffs further these important purposes and policies [of discovery] by ensuring that parties provide discovery in a timely fashion, thereby avoiding trial by surprise and the prejudice that results from belated disclosure.").

the Company . . ."[56] Later in the same sentence, Plaintiffs request that the Court "restrain any further misconduct by" Defendants.[57] Additionally, the Complaint includes three separate counts for injunctive relief—Counts I, III, and V—requesting that I enjoin further breaches of fiduciary duty, breaches of the Stockholders Agreement, and tortious interference, respectively.

As to Count I, I note that neither Horne nor the Director Defendants continued to work for Optimis in a fiduciary capacity during the pendency of this lawsuit. As such, the only basis for Count I appears to be a theory based on some sort of continuing wrong to Optimis based on an action taken by one or more of the named Defendants while employed. Here, Count I seems premised on alleged unfair competition by the Director Defendants based on confidential information they obtained while still employed at Rancho and took with them, or, at least, remembered and ultimately misused after they left Rancho.[58] Horne's Interrogatory 32 specifically asked whether breaches of fiduciary duty by Horne were ongoing when the Complaint was filed and whether those alleged breaches continued as of the date of Plaintiffs' response. Plaintiffs responded that breaches were ongoing and cited "Defendants' ongoing efforts to interfere with the

---

[56]   Compl. ¶ 5.

[57]   *Id.*

[58]   *See Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at \*15 (Del. Ch. May 18, 2009) ("An agent has a duty not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party. This duty includes a prohibition on the use of the principal's confidential information in competition with the principal.") (footnote omitted).

23

company's business and the efforts of OptimisCorp to obtain financing and settle the false claims with Geller."[59] Similarly, Count III requests an injunction for continuing breaches of the Stockholders Agreement, and Count V asks the Court to enjoin alleged continuing tortious interference. Overall, the Complaint makes clear that Plaintiffs seek relief for ongoing wrongs.

The depositions also included questions related to any evidence of continuing violations by Defendants.[60] On the second day of Morelli's deposition, for example, he was asked: "What, if any, specific instances of interference occurred after [the Director Defendants] were no longer officers or directors of OpimisCorp, or employees?"[61] Morelli responded with a laundry list of interference by the Director Defendants relating to practically everyone involved with Optimis or Rancho. Thus, based on the Complaint, the interrogatories, and the depositions, I reject Defendants' argument that they did not receive adequate notice that Plaintiffs are, and have been, alleging wrongs by Defendants that post-date their employment with Optimis or Rancho.

The Gentry Affidavit is another matter entirely. Plaintiffs did not identify Gentry in discovery as a person knowledgeable about the matters asserted in the Complaint.[62] Unlike Levine, she is not listed anywhere else in the interrogatory responses either. In

---

[59] H.I. Resp. 32.

[60] *E.g.*, Morelli Dep. 200-13, 288-99; O'Shea Dep. 144-45.

[61] Morelli Dep. 479.

[62] DD.I. Resp. 14.

fact, Gentry's name surfaces only a handful of times in the depositions, all in the context of a passing reference to her position as the Director of Marketing.[63]   Defendants otherwise were not apprised of the fact that Gentry was a potential witness with relevant knowledge.   Based on the evidence they belatedly attempted to introduce through Gentry's affidavit, I find that Plaintiffs failed to satisfy their obligation seasonably to supplement their interrogatory responses under Rule 26(e)(1)(A).[64]   As a sanction for that failure, the Gentry affidavit will be stricken from the record and Plaintiffs may be precluded from calling Gentry as a witness at trial.

### B.   Additional Factors Influencing This Decision

### 1.   It remains impossible to determine who all the alleged members of the conspiracy are.

As previously mentioned, the number and identity of the members of a conspiracy dramatically affect the scope and mechanics of a case.  Between the Complaint and their interrogatory responses, Plaintiffs fairly identified six members of the alleged conspiracy here: the named Defendants (John Waite, William Atkins, Gregory Smith, and William Horne), George Rohlinger, and Joe Godges.  The proposed Amended Complaint seeks to add as co-conspirators at least Helene Fearon, Stephen Levine, and Jeanine Gunn. Granting the amendment, therefore, would make each of the named Defendants potentially liable for the actions of these three new actors whether or not any of the

---

[63]   Atkins Dep. 84; Kreille Dep. 36; Waite Dep. 298, 331, 486.

[64]   Ct. Ch. R. 26(e)(1)(A) ("A party is under a duty seasonably to supplement the response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters . . . .").

25

named Defendants was involved in those actions. Moreover, if I were to grant the motion to amend, it *still* would not be clear who else allegedly is a member of the conspiracy, because the proposed Amended Complaint repeatedly refers generally to defendants "and their co-conspirators," and to the latter category as including "others."

In the proposed Amended Complaint, the phrase "and others" appears at least six times.[65] Most troubling are the instances alleging acts in furtherance of the alleged conspiracy and naming Defendants, the new actors, and then including the phrase "and others,"[66] or some similar variant.[67] Plaintiffs' proposed amendments would leave open the possibility of their adding new co-conspirators even after the trial date already has been rescheduled three times. Plaintiffs' witnesses have been no more informative in terms of pinning down the alleged participants in the conspiracy. Morelli identified sixteen potential co-conspirators.[68] O'Shea made a blanket accusation with virtually no supporting details that all twenty-four individuals listed in Plaintiffs' response to Horne's Interrogatory 6 were members of the conspiracy, in addition to the named Defendants.[69]

---

[65] Proposed Am. Compl. ¶¶ 4, 17, 20, 22, 64, 68.

[66] *Id.* ¶ 17 ("They—along with Fearon, Levine, Rohlinger, Gunn, Godges and others . . .").

[67] *Id.* ¶ 18 ("Waite and his co-conspirators . . ."); *id.* ¶ 20 (" . . . defendants and their co-conspirators . . .").

[68] Morelli Dep. 14-18, 29-35, 48-49, 150-51 (listing Defendants, Godges, Geller, Laura Brys, Gunn, Jessica Eastman, Doherty, James Lynch, Chuck Speraza, Ashraf Abdelhamid, Robert Johnson, Rohlinger, and Robert Wilbanks).

[69] O'Shea Dep. 80.

In sum, Defendants face a proposed eleventh-hour Amended Complaint asserting a conspiracy composed of at least nine members and the possibility of "others," sworn statements by Morelli as to a sixteen-member conspiracy, and conclusory deposition testimony from O'Shea as to a twenty-eight-member conspiracy. At this late stage, it is unreasonable and inexcusable that the conspiracy remains so amorphous and ill-defined. I conclude, therefore, that granting Plaintiffs' motion to amend would be highly prejudicial to Defendants and deprive them and this Court of the ability to try this case in an orderly and fair way.[70] For example, Defendants might assert new counterclaims in conjunction with their answers to an amended complaint. The timing and other circumstances that gave rise to Plaintiffs' Motion to Amend and Defendants' Motion *in Limine* also persuade me that it would be inappropriate and inequitable to address these problems by entertaining the possibility of yet another postponement of the trial.

### 2. Plaintiffs' arguments that "Defendants knew all along" are unconvincing.

Plaintiffs argue that Defendants can claim no unfair surprise as to the matters currently before me. According to Plaintiffs, because this was Defendants' conspiracy, they knew all along the identities and actions of their co-conspirators. This argument is circular and presumes what Plaintiffs must prove at trial. The burden is on Plaintiffs to

---

[70] The proposed Amended Complaint also alleges breaches of the implied covenant of good faith and fair dealing. I will permit those claims to be included in the trial of this matter. As noted during the September 8, 2014 argument on the motions for summary judgment, I consider the allegations regarding a breach of the implied covenant to be fairly within the scope of the original Complaint. Mots. for Summ. J. Arg. Tr. 51. Accordingly, an amendment to the Complaint is not required on that issue.

support their claims and prove them by a preponderance of the evidence; the burden is not on Defendants to prove they were not members of a conspiracy. Additionally, Plaintiffs possess, and have possessed throughout this case, a significant amount of the information at issue, largely because of the imaging of Optimis's computers that was done in connection with the Section 225 Action.[71] Thus, I reject Plaintiffs' argument that Defendants have suffered no prejudice because they allegedly knew the disputed information all along. To the contrary, Plaintiffs must prove at trial the existence and composition of the alleged conspiracy, and they were required to provide Defendants fair notice of the nature and scope of their conspiracy claims during the pre-trial proceedings.

### 3.       Plaintiffs' "supplementation" was untimely.

On September 5, 2014, Plaintiffs "supplemented" their interrogatory responses by incorporating all information raised in their summary judgment opposition briefs and supporting documents.[72] Those supporting documents include the Fearon, Levine, and Gentry affidavits. As noted, Rule 26(e) requires parties "seasonably" to amend or supplement interrogatory responses in certain specified circumstances. Delaware case law provides sparse guidance on the meaning of the term "seasonably." Black's Law

---

[71]     *See supra* note 50.

[72]     Defs.' Mot. to Exclude Untimely Evidence and Previously Undisclosed Causes of Action at Trial, Exs. C-D ("Plaintiffs amend and supplement their objections and responses with the information contained in Plaintiffs' Brief in Opposition to [the Director Defendants'] Motion for Summary Judgment . . . Plaintiffs' Brief in Opposition to Defendant William Horne's Motion for Summary Judgment, and all documents filed therewith.").

Dictionary defines "seasonable" as: "Within the time agreed on; within a reasonable time."[73] Here, the parties did not agree on a time frame for supplementation. Thus, I interpret "seasonably" to mean within a reasonable time.

Court of Chancery Rule 26(e)(2) requires amendment to a prior discovery response if "the party knows that the response was incorrect when made" or "the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." Horne's Interrogatory 5 requested that Plaintiffs: "Identify every fact that you contend supports your allegations in paragraph 16 of the Verified Complaint that the [Director] Defendants 'began a campaign to undermine Morelli and his software development strategy [and that] the [Director] Defendants also enlisted defendant Horne . . . to join their unlawful conspiracy.'" At the argument on the Motion to Amend and various motions *in limine* on October 22, 2014, Plaintiffs pointed to this interrogatory as evidence that Defendants understood that the Complaint alleged a conspiracy.[74]

Plaintiffs' lengthy response to Horne's Interrogatory 5 described generally a broad-ranging conspiracy involving other unnamed individuals. Besides the named Defendants, it identified only Rohlinger specifically. Throughout this Memorandum Opinion, I have stressed the importance of timely identifying co-conspirators, because the

---

[73] BLACK'S LAW DICTIONARY 1470 (9th ed. 2009).

[74] Mot. to Amend Arg. Tr. 30 ("That was his questioning. He wanted to know what were the facts."). As noted previously, Paragraph 16 of the Complaint contains the only use of the term "conspiracy."

29

addition of a new co-conspirator adds potential liability for all other co-conspirators for actions taken by the new co-conspirator in furtherance of the conspiracy. Depending on when Plaintiffs came into possession of the information specifically identifying the other alleged co-conspirators addressed in this Memorandum Opinion, their response either was "incorrect when made" or else became no longer correct. Accordingly, Plaintiffs had a duty to seasonably supplement their interrogatory responses to disclose the identities of all co-conspirators once Plaintiffs became aware of the identity of additional purported co-conspirators. Because of the effect on liability of adding co-conspirators, I find that Plaintiffs' failure to supplement their interrogatory responses with the identities of the other alleged co-conspirators amounted in substance to a "knowing concealment" within the meaning of Rule 26(e)(2).

Plaintiffs knew about the involvement of Fearon and Levine by at least April 2014, and settled with them in May 2014. From at least that point onward,[75] Plaintiffs had a duty to supplement their interrogatory responses within a reasonable time. Pursuant to the third scheduling order entered on June 5, 2014, fact discovery closed on August 1, 2014. There is no bright-line rule as to when supplementation is seasonable.

---

[75] Plaintiffs may have been aware of Fearon and Levine's alleged co-conspirator status much earlier. The Fearon Rescission occurred in December 2012. As Plaintiffs repeatedly emphasized, Morelli noted the Fearon Rescission in his April 29, 2014 deposition, several days before Optimis settled with Fearon. In the case of Plaintiffs' settlement with Tina Geller, another source of controversy in this case, the negotiations appear to have lasted from roughly May 30, 2013, until December 2, 2013. Even assuming the Company's negotiations with Fearon and Levine were completed much more quickly, I conclude that Plaintiffs had a duty to supplement promptly after the May 2014 settlements.

Given the crucial manner in which conspiracy law affects liability and the likely impact of adding new co-conspirators on the scope of discovery, however, Plaintiffs had to have supplemented their interrogatory responses before the close of discovery to meet the "seasonably" requirement. Three full months of discovery remained after the May 2014 settlements. Wherever the outer limits of seasonable supplementation lay, Plaintiffs' September 5 supplementation falls significantly outside of those bounds. I consider the Fearon, Levine, and Gentry affidavits equally untimely to the extent Plaintiffs might rely on them or their summary judgment briefs as the equivalent of the required supplementation.

### 4. Summary

The original Complaint adequately placed Defendants on notice of the existence of an alleged conspiracy, wrongs that could amount to aiding and abetting, and breach of contract claims that would include a breach of the implied covenant of good faith and fair dealing. Those claims are in this case. During discovery, however, Plaintiffs did not identify adequately the members of the conspiracy or all of the wrongful acts committed as part of the conspiracy. Based on Plaintiffs' failure seasonably to supplement their discovery responses and undue delay in revealing additional alleged members of the conspiracy, the substantial prejudice those actions have caused to Defendants in terms of time, expense, inconvenience, and the difficulty in preparing for trial, and the prejudice Defendants will continue to suffer if I grant Plaintiffs leave to file their proposed Amended Complaint, I hold as follows:

31

(1) The conspiracy, as originally pled and fairly disclosed in discovery, is limited in terms of co-conspirators to John Waite, William Atkins, Gregory Smith, William Horne, Joe Godges, and George Rohlinger. Any wrongful acts proven to have been committed by one or more of those co-conspirators in furtherance of the conspiracy may be attributed to the four named Defendants;

(2) Plaintiffs may not add additional co-conspirators to the alleged conspiracy or seek to impose liability on Defendants on a theory of conspiracy or aiding and abetting for any acts that are not currently disclosed in the record of this action or that do not involve actions of one or more of the alleged co-conspirators identified in Paragraph (1) above;

(3) Any and all claims based on the Fearon Rescission are excluded from this case;

(4) Plaintiffs adequately have pled and disclosed claims relating to Defendants' conduct after their employment with Optimis ended to the extent indicated in this Memorandum Opinion; and

(5) Catherine Gentry's affidavit is stricken from the record and, because of Plaintiffs' failure to comply with the discovery rules with regard to Gentry, Plaintiffs may be prohibited from calling her as a witness at trial.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Amend is denied and Defendants' Motion *in Limine* is granted in part and denied in part to the extent indicated in this Memorandum Opinion.

**IT IS SO ORDERED.**