IN THE UNITED STATES DISTRICT COURT FOR 
 THE MIDDLE DISTRICT OF ALABAMA 
 EASTERN DIVISION 

KEPRO ACQUISITIONS, INC., ) 
 ) 
 Plaintiff, ) 
 ) 
v. ) Case No. 3:19-cv-842-ALB 
 ) 
ANALYTICS HOLDINGS, LLC, ) 
HDI SOLUTIONS, LLC, and ) 
GUY R. DiBENEDETTO, JR., ) 
 ) 
 Defendants. ) 
 MEMORANDUM OPINION AND ORDER 
This matter comes before the court on Defendants Analytics Holdings, LLC; 
HDI Solutions, LLC; and Guy R. DiBenedetto, Jr.’s Motion to Dismiss. (Doc. 15). 
Upon consideration, the motion is DENIED. 
 BACKGROUND 
This case is about a contract to purchase a business and its associated 
intellectual property rights. The following facts are taken from the operative 
complaint and are assumed to be true for the purposes of this opinion. 
Plaintiff KEPRO Acquisitions, Inc. offers products and web-based services 
for healthcare management to public and commercial clients. On or about July 11, 
2018, KEPRO Acquisitions closed a Security Purchase Agreement (the “Purchase 
Agreement”) with Analytics Holdings to purchase one of its subsidiaries, Health 
Information Designs, LLC (the “Subsidiary”), that licensed three distinct products: 
RxExplorer®, RxPert®, and PA Logic. (Doc. 1 ¶¶ 9–11). The Purchase Agreement 

is governed by Delaware law and contains a Survival Clause which requires any 
claims related to the contractual representations to be brought within 180 days of 
closing. The Purchase Agreement also contains Non-Reliance Provisions which 

state that the parties were relying solely on the representations and warranties 
contained within the Purchase Agreement. 
As agreed, and before the Purchase Agreement closed, the subsidiary 
transferred its PA Logic-associated business to a second Analytics Holdings 

subsidiary, HDI Solutions, LLC (“HDI Solutions”). The Subsidiary owned the 
licenses, but under the Transition Services Agreement (the “Transition Agreement”), 
which governed the post-closing transfer of the Subsidiary-owned licenses, HDI 

Solutions used the licenses. The two products owned by the Subsidiary, 
RxExplorer® and RxPert®, function by accessing a third-party database called 
OpenEdge Database, licensed from Progress Software Corporation (“Progress”). 
Without these licenses, the products cannot function. While under the control of HDI 

Solutions, the two products used Subsidiary-owned licenses to access the database. 
(Doc. 1 ¶¶ 15–21). 
On or about June 11, 2018, Guy R. DiBenedetto, Jr. signed the Closing 

Certificate in his capacity as CEO of the Subsidiary and Analytics Holdings, the 
Purchase Agreement closed, and Analytics Holdings transferred its ownership 
interests in the Subsidiary to KEPRO Acquisitions. (Doc. 1 ¶ 22). 

A little over six months after the Agreement closed, KEPRO Acquisitions 
asked HDI Solutions about the transfer of the licenses. HDI Solutions responded that 
according to Progress, the licenses were non-transferable. (Doc. 1 ¶ 25). KEPRO 

Acquisitions alleges that it entered the Agreement only because Defendants had 
represented that they held a sufficient number of licenses to support RxExplorer® 
and RxPert® and that those licenses were transferable. KEPRO Acquisitions further 
alleges that Defendants did not own sufficient licenses and had instead accessed the 

OpenEdge Database through deliberate misappropriation. (Doc. ¶¶ 26–32). KEPRO 
Acquisitions filed suit for common law fraud and civil conspiracy, seeking the 
$640,000 necessary to obtain its own OpenEdge Database licenses. 

 DISCUSSION 
Defendants argue that KEPRO Acquisitions’ Complaint fails to plead fraud 
with particularity and that, even if it were sufficiently plead, the Survival Clause and 
Non-Reliance Provisions would bar KEPRO Acquisitions’ claims. KEPRO 

Acquisitions counters that pleading fraud with particularity is a low bar, which it has 
successfully hurdled; that the Survival Clause does not exclude fraud claims; and 
that the Non-Reliance Provisions expressly allow consideration of the documents to 

which Defendants object. The Court agrees with KEPRO Acquisitions. 
A. KEPRO Acquisitions Pleaded Fraud with Particularity 
Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened 

pleading standard on plaintiffs in a fraud case: “In alleging fraud or mistake, a party 
must state with particularity the circumstances constituting fraud or mistake. Malice, 
intent, knowledge, and other conditions of a person’s mind may be alleged 

generally.” Fed. R. Civ. P. 9(b). But this requirement cannot be read in isolation 
from Rule 8’s “short and plain statement of the claim” requirement and the 
plausibility standards announced in Twombly and Iqbal. Wright & Miller, 5A Fed. 
Prac. & Proc. §1298 (4th ed.). The degree of detail that Rule 9(b) requires “often 

turns on the substantive context in which the fraud is alleged to have occurred.” Id. 
Essentially, the plaintiff must provide enough detail “to give adequate notice to an 
adverse party and to enable that party to prepare a responsive pleading.” Id. 

In this case, the alleged fraud arose from a written contract between 
sophisticated parties. The Delaware Court of Chancery’s approach to pleading in 
this context is persuasive: pleading a fraud claim based on written representations 
under Court of Chancery Rule 9(b)1 is “relatively easy” because the who, where, and 

when are contained in the contract and the defendant’s reason for fraud is inducing 
   
1 The text of Delaware Court of Chancery Rule 9(b) is substantively the same as Federal Rule 9(b). 
Compare Del. Ch. Ct. R. 9(b) (“In all averments of fraud or mistake, the circumstances constituting 
fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition 
of mind of a person may be averred generally.”) with Fed. R. Civ. P. 9(b) (“In alleging fraud or 
mistake, a party must state with particularity the circumstances constituting fraud or mistake. 
Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.”). 
the plaintiff to enter into the contract. Prairie Capital III, L.P. v. Double E Holding 
Corp., 132 A.3d 35, 62 (Del. Ch. 2015).2 All that remains for the plaintiff is to 

“allege facts sufficient to support a reasonable inference that the representations 
were knowingly false.” Id. 
Here, KEPRO Acquisitions’ fraud allegations are based on written 

representations in the Purchase Agreement that DiBenedetto signed. In this context, 
the who, what, where, and when are easily located within the contract. And based 
on Defendants’ briefing, Defendants clearly know what they are being accused of. 
Because KEPRO Acquisitions’ allegations rely on the written agreement, KEPRO 

Acquisitions’ accusations need only support a reasonable inference that Defendants’ 
representations were knowingly false. KEPRO Acquisitions has done so. 
Defendants object that allegations in the following areas by KEPRO 

Acquisitions are unclear: the Pre-Purchase Representations, the Closing 
Representations, the Transition Agreement, and the Conspiracy claim. 
First, Defendants object that they cannot tell to whom KEPRO Acquisitions 
is referring in its introduction: “Defendants represented that they held a sufficient 

number of licenses to the OpenEdge Database to support [the Subsidiary’s] products 

   
2 Although the contracts in this case are governed by Delaware law, the Court applies federal 
pleading standards under the Erie doctrine. Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, 
D.D.S., P.A., 781 F.3d 1245, 1260 (11th Cir. 2015) (“[W]here a state employs a heightened 
pleading requirement, ‘a federal court … should instead follow’” the Federal Rules.”). 
and customers and that those licenses could be transferred to [the Subsidiary].” (Doc. 
1 ¶1). KEPRO Acquisitions labeled the offending paragraph “Introduction” in bold 

type. The detailed allegations are found later on in the Complaint under the “Factual 
Allegations” heading. Defendants’ argument is meritless. 
Second, HDI Solutions argues that only the Subsidiary and Analytics 

Holdings were parties to the Closing Certificate Representations, so HDI Solutions 
cannot be held legally responsible for any fraud in these representations. HDI 
Solutions’ argument is flawed on both substantive and procedural grounds. Under 
Delaware substantive law, any misrepresentation signed by a corporate officer in his 

official capacity is imputed to that officer personally and to the corporate entities for 
which the officer is signing. Prairie Capital, 132 A.2d at 59–60. Further, 
representations made by a company being acquired are legally imputed to related 

individuals and entities who knowingly influenced that company’s 
misrepresentations. Id. at 60–61. So, either DiBenedetto’s official signature is 
imputed to him and to Analytics Holdings and HDI Solutions as their CEO, or the 
representations made by the Subsidiary are imputed to the individuals and entities 

who knowingly influenced its misrepresentations: Analytics Holdings, HDI 
Solutions, and DiBenedetto. Either way, HDI Solutions’ fate is legally tied to the 
Subsidiary and Analytics Holdings. 
As for the Eleventh Circuit’s procedural pleading requirements, a plaintiff 
need not plead a principal’s fraudulent misrepresentation if the principal’s agent 

made the misrepresentation. Ackerman v. Nw. Mut. Life. Ins. Co., 172 F.3d 467, 471 
(11th Cir. 1999). So, to plead fraudulent misrepresentation by the principals, i.e., 
Analytics Holdings and HDI Solutions, KEPRO Acquisitions need only plead their 

agent DiBenedetto’s fraudulent misrepresentation. KEPRO Acquisitions meets this 
pleading standard by alleging that “[a]ny representation made by [the Subsidiary] in 
the Agreement was in fact decided and controlled entirely by the Defendants.” (Doc. 
1 ¶ 34). And “[t]o the extent such misrepresentations were purportedly made to 

KEPRO by [the Subsidiary], all Defendants participated in, controlled, and directed 
[the Subsidiary] to make such misrepresentations with illicit intent, knowing that 
[the Subsidiary]’s representations were material and false.” (Doc. 1 ¶ 50). These 

allegations are sufficient to plead DiBenedetto’s fraudulent misrepresentation. 
Third, Defendants object that KEPRO Acquisitions has not pointed to a 
specific provision of the Transition Agreement that required HDI Solutions to 
transfer the OpenEdge Database licenses. In fact, Defendants argue, the Transition 

Agreement provided by KEPRO Acquisitions in Exhibit 2 does not reference the 
transfer of such licenses at all. However, the Complaint states that “[p]ursuant to 
Appendix A-B to the [Transition Agreement], HDI was to transfer to [the 
Subsidiary] the licenses necessary for RxExplorer® and RxPert® to access the 
OpenEdge Database.” (Doc. 1 ¶ 20). 

KEPRO Acquisitions has sufficiently pleaded that the Transition Agreement 
required transfer of the OpenEdge Database licenses for two reasons. After KEPRO 
Acquisitions told HDI Solutions that Appendix A-B of the Transition Agreement 

required transfer of the licenses, (Doc. 1-3 at 2), HDI Solutions admitted that both 
HDI Solutions and KEPRO Acquisitions had a “good faith belief” that the licenses 
would be transferrable. (Doc. 1-4 at 2). And in KEPRO Acquisitions’ Complaint, 
KEPRO Acquisitions noted that Appendix A-B to the Transition Agreement 

explicitly mentions the OpenEdge Database licenses. Doc. 1 ¶ 20). Defendants later 
attached to their reply a complete version of the Transition Agreement which 
included Appendix A-B. (Doc. 25-1). So, Defendants either knew what document 

KEPRO Acquisitions was referencing at the time of the correspondence between 
their counsel and KEPRO Acquisitions’, or they knew when they filed a copy of the 
Transition Agreement and Appendix A-B. 
Fourth, Defendants argue that KEPRO Acquisitions’ has not sufficiently 

pleaded its conspiracy claim and that the conspiracy claim rises or falls with KEPRO 
Acquisitions’ underlying claims. Am. United Life Ins. Co. v. Martinez, 480 F.3d 
1043, 1065 (11th Cir. 2007) (“[W]here a conspiracy claim alleges that two or more 
parties agreed to commit fraud, the plaintiff must also plead this act with 
specificity.”). KEPRO Acquisitions has sufficiently plead the conspiracy. 

Because KEPRO Acquisitions’ underlying claims survive, its conspiracy 
claim survives as well. In Delaware, “civil conspiracy is not an independent cause 
of action”; it must arise from an underlying wrong. Ramunno v. Cawley, 705 A.2d 

1029, 1039 (Del. 1998). This underlying wrong can be as simple as committing a 
“tortious act in concert with [an]other or pursuant to a common design ….” Prairie 
Capital, 132 A.3d at 63 (quoting Restatement (Second) of Torts § 876). Generally, 
corporations cannot conspire with their subsidiaries, lest “every breach of contract, 

tort or other case involving a controlled subsidiary … become a vehicle to sue 
controllers.” Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1040 
(Del. Ch. 2006). But for every general rule, there is an exception: in some cases, 

“[t]he fact that a corporation owns all of the equity of another corporation and that 
both corporations have the same directors and officers does not mean the separate 
corporations cannot collaborate on a common illegal scheme.” Id. at 1044. One such 
case is when entities lack common economic interests to the point a corporation 

diverts value from a subsidiary to enrich itself. As for corporate managers, they 
generally cannot conspire with their corporation, unless they act for their own 
personal financial gain rather than for the benefit of the corporation. Id. at 1045 n.63. 
Here, KEPRO Acquisitions alleges that Defendants committed fraud in 
concert with one another: DiBenedetto signed the Purchase Agreement on behalf of 

Analytics Holdings and the Subsidiary and the Transition Agreement on behalf of 
the Subsidiary and HDI Holdings, despite knowing that it operated with 
misappropriated OpenEdge Database licenses which could not be transferred to 

KEPRO Acquisitions. Essentially, KEPRO Acquisitions alleges that Defendants 
conspired with each other and with the Subsidiary to deprive it of its most valuable 
assets before transferring it to KEPRO Acquisitions. As for DiBenedetto, KEPRO 
Acquisitions alleges that he acted for his own personal financial gain because he 

secured new compensation under an employment contract with the Subsidiary 
without having to give up his position as CEO of Analytics Holdings and HDI 
Solutions. (Docs. 1-1 § 6.1(h), 1-2 at 58–70). 

From the Defendants’ briefing, it is apparent that they know exactly what 
KEPRO Acquisitions is referencing in its Complaint regarding the Pre-Purchase 
Representations, the Closing Representations, the Transition Agreement, and the 
Conspiracy. KEPRO Acquisitions has met the Rule 9(b) standard and Defendants 

understand what they are being accused of. 
B. Non-Reliance Provision 
The Agreement contains a Non-Reliance Provision in Section 4.11, which 

states that the parties are sophisticated, have been given access to the documents 
necessary to make an informed decision, have relied solely on their own 
investigation and the representations in the Agreement, and that no representations 

or warranties exist beyond those in the Agreement and Closing Certificate. 
Defendants argue that these provisions prevent KEPRO Acquisitions from relying 
on the Pre-Purchase Representations and the Transition Agreement Representations. 

First, Defendants allege that the Pre-Purchase Representations described in 
Paragraph 1 of the Complaint are barred by the Non-Reliance Provisions because 
they are outside the scope of the Agreement. But, as noted above, the Pre-Purchase 
Representations are merely shorthand for the representations detailed more 

specifically in the body of the Complaint. The Complaint’s introduction cannot be 
separated from the Complaint’s body, which alleges in Paragraph 36 that 
“Defendants represented in § 2.13(o) of the Agreement that ‘[the Subsidiary] has 

sufficient rights to use all … databases … all of which rights will survive unchanged 
immediately after the consummation of the Transactions or which will be available 
under the Transition Services Agreement.’” (Doc. 1-1 § 2.13(o)). Because the Pre-
Purchase Representations were part of the Agreement, the Non-Reliance Provisions 

are inapplicable. 
Second, Defendants argue that the Transition Agreement Representations are 
barred by the Non-Reliance Provisions in Section 4.10, 4.11, and 9.6 because they 

are outside the scope of the Agreement. Again, these provisions limit the parties’ 
reliance to the Agreement and any Closing Certificate. The Closing Certificate states 
that all representations in the Agreement were true and correct and that the 

Subsidiary and Analytics Holdings had performed all of the required obligations. 
(Doc. 1-5 at 2). So, by signing the closing certificate, DiBenedetto affirmed that all 
representations in the Agreement were true and correct, including Section 2.13(o), 

which represented that sufficient licenses would be available under the Transition 
Agreement. 
Nothing in the Non-Reliance Provisions bars KEPRO Acquisitions from 
relying on the Pre-Purchase and Transition Agreement Representations; in fact, the 

Non-Reliance Provisions expressly allow KEPRO Acquisitions to rely on these 
representations. 
C. Survival Clause 

The Agreement also includes a Survival Clause, which requires certain claims 
to be filed within 180 days of closing. (Doc. 1-1 § 8.1). But the Survival Clause 
includes an exception for fraud: “Except as provided in this Section … [n]o [party] 
shall bring any claim after the Closing with respect to this Agreement or the 

Transactions, whether in contract, tort or otherwise, other than … a claim for … 
common law fraud against the party who committed such fraud….” (Doc. 1-1 § 8.7). 
So, the Agreement expressly excludes KEPRO Acquisitions’ fraud claim and fraud-

dependent conspiracy claim. Under Delaware law, courts will honor a bargained-for 
carve-out for fraud. ENI Holdings, LLC v. KBR Grp. Holdings, LLC, 2013 WL 
6186326, at *15–16 (Del. Ch. Nov. 27, 2013) (fraud claim allowed because of 

contractual carve-out for fraud); GRT, Inc. v. Marathon GTF Tech., LTD, 2011 WL 
2682898, at *13 (Del. Ch. July 11, 2011) (fraud claim excluded because no 
contractual carve-out for fraud). Regardless, Delaware courts will generally not 

enforce a survival clause in the face of fraud. Id. at *13 n.68; Abry Partners V, L.P. 
v. F&W Acquisition LLC, 891 A.2d 1032, 1061 (Del. Ch. 2006) (“[A] perpetrator of 
fraud cannot close the lips of his innocent victim by getting him blindly to agree in 
advance not to complain against it.”), aff’d RAA Mgmt., LLC v. Savage Sports 

Holdings, Inc., 45 A.3d 107, 118–19 (Del. 2012). 
Defendants also argue that KEPRO Acquisitions is attempting to bootstrap a 
breach of contract claim into a fraud claim. When it comes to bootstrapping, 

Delaware law follows the old aphorism “You can put lipstick on a pig, but it’s still 
a pig.” Or, in more technical terms, a plaintiff cannot convert a breach of contract 
claim into a fraud claim merely by “adding the term ‘fraudulently induced’ to a 
complaint or alleging that the defendant never intended to comply with the 

agreement ….” MicroStrategy Inc. v. Acacia Research Corp., 2010 WL 5550455, at 
*17 (Del. Ch. Dec. 30, 2010). Here, at least at this stage of the proceedings, KEPRO 
Acquisitions has not merely dressed up a homely hog. It may be a different story at 

summary judgment or trial, but the complaint’s allegations of fraud are sufficiently 
different from a breach-of-contract claim that they are excluded from the 180-day 
limitations period. 

 CONCLUSION 
The Motion to Dismiss is DENIED, and the Court’s previous stay of 
discovery, (Doc. 29), is LIFTED. Defendants shall file an Answer to the Complaint 

by April 22, 2020. 
DONE and ORDERED this 1st day of April 2020. 

 /s/ Andrew L. Brasher 
 ANDREW L. BRASHER 
 UNITED STATES DISTRICT JUDGE